# GENERAL COURT, MAY TERM, 1805.

## HARPER vs. HAMPTON

May 1805

Harper
vs
Hampton

*If a contract is made in* South Carolina, *with a view to the receipt of money in* Pennsylvania, *the cause of action accrues upon the receipt of the money in* Pennsylvania, *and the statute of limitations of* South-Carolina *is not a bar to the action*

*If A contracts with B to sell a quantity of land belonging to B under an agreement that he is to have over one half the purchase money, A is competent, if he does sell, to maintain an action in his own name for the whole of the purchase money, there being no necessity that B should join in the action*

*In construing a contract, the court will be governed by the apparent meaning of the parties to be collected from the language of the contract and the nature of the transaction, and will not rely on the technical meaning of the words used*

ASSUMPSIT. The declaration and pleadings in this case are stated, *ante* 453. The cause again came on for trial at the last term, (October 1804,) when

1. *Mason,* for the defendant, contended that the plaintiff's cause of action, if he had one, arose on a demand by the plaintiff on the defendant, made in the state of *South Carolina;* and to that demand the defendant's 4th, 5th, 8th, 9th, 12th, 13th, 16th, 17th and 19th pleas, are a bar. He read the several papers herein after referred to, for the purpose of establishing this position, and prayed the court to direct the jury, that the cause of action, if any, accrued in *South Carolina.*

*Harper.* The defence taken by the defendant is two fold: 1. The statute of limitations of *South Carolina,* and 2. The general issue. Under the pleas of the statute, it is alleged that the cause of action, if any, accrued in *South Carolina.* The replications traverse this fact, and state that the cause of action first accrued in *Pennsylvania.* Upon these replications

In construing a contract, extraneous matter may be resorted to.

What seems to be technically a warranty may be considered to mean generally any engagement by which a liability is created, where such appears to be the intention of the parties.

A covenant can only be dissolved by matter of equal solemnity with itself.

In an action of covenant, accord and satisfaction is a good plea to breaches actually accrued, but not otherwise

Where A, as the agent of B, sells his land, and receives the notes of the purchaser, if B authorises him to hold such notes till he gives him security to indemnify him from all liability, which by the sale he may come under to the purchaser, A is only answerable for the value of the notes at the time when such security is offered, and not for their value at the time he receives them.

What stipulation in a contract amounts to a condition precedent.

Where an agent sells, (among others,) the lands of his principal, and undertakes with the purchaser to have the whole resurveyed, he should give his principal notice of such resurvey; and whether there be such an undertaking, and if so, whether the notice be in fact given, are facts for the decision of the jury.

If notes held by an agent depreciate in value, it is the loss of the principal.

The opposite party is entitled to a continuance where a commission is returned during the term.

The court decide on the competency of evidence, and not on the effect of it.

A deed by attorney is invalid, unless his authority is *strictly pursued.* Such a deed should regularly be in the name of the principal.

Whether a deed be valid or not, to convey lands in another state, must be determined by the laws of this state, unless the laws of the foreign state be given in evidence.

Where an agent contracts a liability for his principal, with an engagement by the principal to save him harmless, he is not answerable to the principal until such security is given him, and this though many years have elapsed without his being called on to answer for such liability.

Where notice is necessary to be given by an agent to his principal, and under what circumstances the jury may presume such notice to have been given.

Where notice is not necessary to be given by an agent to his principal.

The tender of a bond of indemnity, after action brought, is insufficient where indemnity is necessary to the plaintiff's recovery.

issues are joined. The contract is, that the defen
dant should sell the land, and a deed for the land is
delivered to him as an *escrow*. The sale was made
by the defendant in *Philadelphia*, and notes were
there received. The contract was consequently con-
summated in *Philadelphia*. The receipt of the notes
by the defendant completed the contract. *Esp.* 128,
129. But if the cause of action arose in *South Carolina*
on the demand for the money, then limitation does
not bar, for no demand is proved to have been made
until 1800.

<div style="margin-left:auto;text-align:right;">MAY 1805.

Harper
vs
Hampton</div>

CHASE, Ch. J. The contract is an inducement to
the action. No cause of action accrued to the plain-
tiff until the notes were received by the defendant;
and if there is a cause of action, it accrued in the
state of *Pennsylvania* on the receipt of the money or
notes, and the statute of limitations of *South Carolina*
does not apply to the case.

2. *The first bill of exceptions.* The plaintiff to sup-
port the issues on his part read in evidence to the ju-
ry an original agreement in writing, executed by the
plaintiff and defendant on the 1st of March 1803,
for the admission of papers and facts as evidence in this
cause, drawn up by the plaintiff himself, he and the de-
fendant being together when it was written, both agree-
ing to and signing it. This agreement was, that "copies
of all papers recorded in any public office of record
within the *United States*, shall be received in evidence,
on both sides, provided such copies be certified under
the hand of the officer, and the seal of such office, al-
though any other formality may be omitted, and that
no objection shall be made to such copy for the want
of any other formality." The agreement also made
evidence seven letters from the plaintiff to the defen-
dant; sundry papers marked 8, 9, 10; an original
agreement between the plaintiff and defendant respec-
ting the lands to be sold by the defendant for the
plaintiff, dated August 25th, 1794; an original agree-
ment of the defendant and *John Hall* with *Robert Mor*-

<div style="font-size:smaller;">Where A claim-
ing a quantity of
land, contracts
with B. that if he
obtains a grant
therefor he shall
be entitled to one
half, and agrees
that he may sell,
&c. The grant
being obtained, B
contracts for him-
self, and as attor-
ney for A with C
for the sale of a
part thereof, and
suit is brought by
B against C for the
whole purchase
money—*Held*, that
it was not neces-
sary to join A in
the action</div>

*ris* and *John Nicholson*, relating to the sale of lands, dated November 15th, 1794; another original agreement between *John Hall*, in behalf of himself and *Gideon Dennison*, and the defendant, dated about the same time, and relating to the said sale and lands; which paper not being here, cannot be endorsed. The agreement stated that the plaintiff did not admit that he ever saw the last mentioned paper, or was informed of it, or knew of its existence or substance, till yesterday, when it was mentioned to him by the defendant. The plaintiff also agreed, that any other letters from himself to the defendant, should be received in evidence. The agreement further stated—"the defendant admits that he did sell the lands mentioned in the agreement *between him* and the plaintiff, to *Robert Morris* and *John Nicholson*— that they were included in the sale of lands to which the agreement between him and *John Hall* on the one part, and *Robert Morris* and *John Nicholson* on the other, relates, that he received payment for them in notes of the said *Morris* and *Nicholson* within a few days after the date of the agreement last mentioned, and at the rate and in the manner by that agreement stipulated; but he does not admit that the plaintiff ever made any demand of the said notes, or ever tendered to him any indemnity or counter security according to the tenor of the aforesaid agreement between him and the plaintiff. He also admits in evidence the paper marked *Agreement A.* But he does not admit that the said paper is in any degree connected with the aforesaid agreement between him and the plaintiff. He also admits that the papers above mentioned marked 8, 9, 10, relate to the part of the said land, which by virtue of the said agreement A. belonged to *Jacob Rumph*, and not to the moiety thereof, which by that agreement was the property of the plaintiff. The plaintiff admits, that before the beginning of the year 1800, the notes of *Morris* and *Nicholson* had ceased to be of any value, and that before that time the lands in question had been sold and conveyed by *M.* and *N.* He also admits in evidence a receipt from *Gar-*

*rett Cottringer*, dated November 21st, 1794, a copy of which is endorsed on the aforesaid agreement between the defendant and *John Hall* on the one part, and *M.* and *N.* on the other."

The plaintiff further read in evidence to the jury, an original agreement between *Jacob Rumph* and the plaintiff, dated the 22d of August 1794, and referred to in the above admission as the paper marked *Agreement A.* That agreement is as follows: "State of *South Carolina.* Memorandum of an agreement entered into at *Orangeburgh* on the 22d of August 1794, between Colonel *Jacob Rumph* and *Robert Goodloe Harper.* Colonel *Rumph* having surveyed and passed through the location and surveyor general's offices, a tract of land in the fork of *Edisto, Orangeburgh* district, containing two hundred and eighty thousand acres, and particularly described in the plot thereof now of record in the said offices, about the granting of which land difficulties have arisen, and doubts are entertained, it is agreed hereby between him and the said *Robert Goodloe Harper,* that if the latter shall be able to obtain a grant for those lands, he shall, in consideration of that service and his trouble, and also of his trouble and expenses in selling them, be entitled *to one equal moiety* of all the vacant lands within the said survey, *and of the monies to arise from the sale*— such lands, as people residing within the limits of the survey may have heretofore surveyed for the purpose of settlement or cultivation, or by way of addition to their plantations, being reserved for their use, and confirmed to them after the grant is obtained; and also such lands as *David Coalter* may already have surveyed in his own name within those limits, being reserved for, and in like manner conveyed to him. And it is further agreed, that all expenses hereafter to be incurred in procuring the said grant, or selling the lands, shall be borne by the said *Harper,* without any responsibility on the part of Col. *Rumph.* The net profits of the sales to be divided between them. And as there is little doubt that the said limits *contain* 100,000 acres of vacant land at the least, the said *Harper,* should an

opportunity offer, shall sell *that quantity* immediately. And to enable him to do so, Col. *Rumph*, as soon as the grant is obtained, shall execute conveyances for 100,000 acres, out of the survey, to such persons as the said *Harper* shall direct, or such greater or less quantity as on searching the offices, which the said *Harper* shall immediately do, may appear to be vacant, and those conveyances, should it be required, shall contain all proper clauses of warranty. After this sale, no other shall be made till the quantity of lands to be reserved shall be ascertained, after which the balance of vacant land shall either be sold, and the amount of sales equally divided between the said parties, or the lands themselves shall be divided between them by proper conveyances, in equal moieties, according to quantity and quality, which ever shall be agreeable to the parties or their representatives. In witness," &c. Signed and sealed by *Rumph* and *Harper*.

The plaintiff also read to the jury the following original power of attorney from *Rumph* to him, dated the 22d of August 1794, the execution of which was admitted. "State of *South Carolina*. Know all men, that I, *Jacob Rumph*, of *Orangeburgh* district, in the said state, have constituted and appointed, and hereby do constitute and appoint, *Robert Goodloe Harper*, of *Charleston*, in the said state, attorney at law, my true and lawful attorney, for me and in my name and stead, to take all lawful, regular and necessary steps, for procuring and recovering a grant from the governor of this state, in due form of law, of a certain tract of land surveyed by me in the fork of *Edisto* river, *Orangeburgh* district, containing two hundred and eighty thousand acres more or less; and when and as soon as the said grant shall be obtained, to sell and in my name convey by proper deeds, as my attorney, all such parts of the said survey, being at this time vacant land, as he shall judge expedient and proper, in fee simple, for the best price that he can obtain, and to any persons whomsoever, and to insert into the said deeds of conveyance all proper and necessary

clauses of warranty should it be required. And I do
hereby agree to and declare myself bound by all that
my said attorney shall do in the premises by virtue of
these presents, and engage to supply all such acts on
my part as may be necessary for further giving vali-
dity to his acts therein. In witness," &c. The plain-
tiff also read in evidence to the jury, an original
agreement between him and the defendant, dated the
25th of August 1794, the execution of which was ad-
mitted. It is as follows: "State of *South Carolina.*
Having this day received from *Robert Goodloe Harper*
a conveyance from him, as attorney of *Jacob Rumph,*
to *John Hall,* of *Philadelphia,* for one hundred and fif-
ty thousand acres of land in the fork of *Edisto,* in the
state of *South Carolina,* I do hereby certify, that the
said conveyance is delivered to me as an *escrow,* to
be delivered to the said *John Hall,* upon his paying or
properly securing the purchase money, *which purchase
money is to be received by me for the use of the said
Harper, after deducting expenses, and accounted for to
him;* and the said *Harper* also agrees for himself, and
the said *Rumph,* that for all *warranties or guaranty
that the said Wade Hampton shall enter into about the
said lands,* they will give him a sufficient indemnity
and counter security. In witness," &c. The plain-
tiff then read in evidence to the jury the conveyance
of 150,000 acres of the said land to *John Hall,* dated
the 10th of September 1794, which is admitted to be
the deed referred to in the agreement of the 25th of
August 1794, as the deed delivered by the plaintiff to
the defendant as an *escrow.* This deed recites the
survey made by *Rumph*—his letter of attorney to *Har-
per*—*Harper's* having obtained a grant on such survey
for 281,197 acres, from the then governor of *South Ca-
rolina,* dated the 5th August 1793, and his sale of
150,000 acres of it to *Hall,* for £750 sterling, and
then goes on as follows:   "Now this indenture
made the 10th of September 1794, and of *Ame-
rican* independence the 19th, between the said
*Robert Goodloe Harper,* for and as attorney of the
said *Jacob Rumph,* on the one part, and the said

May 1805

Harper
vs
Hampton

*John Hall* on the other part—witnesseth, that the said *Robert Goodloe Harper*, for and as attorney of the said *Jacob Rumph*, and in pursuance of the above mentioned power of attorney, hath granted, released and confirmed, and by these presents, doth grant, bargain, sell, release and confirm, unto the said *John Hall*, all that plantation. parcel or tract of land, situate in *Orangeburgh* district aforesaid, in the fork of *Edisto*, containing 1:0 000 acres, being the upper or westernmost part of the said survey of 281,197 acres, with all and singular," &c. &c. "To have and to hold all and singular the said tract of 150,000 acres, with the appurtenances, in the actual possession of the said *John Hall* now being, by virtue of a deed of bargain and sale, for one year, from the said *Robert Goodloe Harper*, to him the said *John Hall*, bearing date the day before the day of the date hereof, unto him the said *John Hall*, his heirs and assigns for. ever, to and for his and their only and proper use. And the said *Robert Goodloe Harper*, for himself and his heirs," &c. "and for the said *Jacob Rumph*, his heirs," &c. "as his attorney, by virtue of the said power, doth," &c. Here follows a *covenant*, "that if the aforesaid quantity of 150.000 acres of land, of clear and undisputed title, free from all grants, conveyances, judgments, mortgages, or other incumbrances of any kind, prior to this conveyance, should not be found within the said survey according to the limits above described." that the said *Harper* and *Rumph*, and each of them, "will immediately, after such deficiency shall appear or be discovered, make it up by conveying to the said *Hall*, his heirs," &c. "a good, legal, and indefeasible estate, in fee simple, by proper and legal conveyances," &c. "for and of other lands in this state of equal quality with those hereby intended to be conveyed, and to the amount of such deficiency, so as to convey to and vest in the said *Hall*, his heirs and assigns, the said quantity of 150,000 acres of land, free from incumbrances" &c. A *further covenant*, that *Rumph*, his heirs and assigns, shall make and execute all such further acts and deeds, &c. for the more per-

fect assuring the premises, &c. to *Hall* and his heirs, &c. "In witness whereof the said parties have hereunto set their hands and seals, at *Columbia*, the day and year first above written, this conveyance being in consideration of the sum of £750 sterling.

Rob. G. *Harper*, (Seal.)
Attorney for *Jacob Rumph.*

Signed, sealed and delivered,
in the presence of us, H. *Hampton*,
John *Lindsey*."

This deed was proved and recorded, &c.

The plaintiff then read in evidence to the jury the admissions of the defendant contained in the paper first mentioned, that he had sold the said 150,000 acres of land to *Robert Morris* and *John Nicholson* of *Philadelphia*; and to prove that *John Hall* the grantee in the said deed, (so delivered to the defendant as an *escrow*,) conveyed the said lands to *Morris* and *Nicholson*, by deed bearing date on the 17th day of November 1794, the plaintiff produced the same in evidence to the jury, as follows: "*This Indenture*, made the 17th day of November 1794, between *John Hall*, of," &c. "and *Eliza Ann* his wife, of the one part, and the honourable *Robert Morris* of," &c. "and *John Nicholson* of," &c. "of the other part. *Whereas*," &c. (reciting the *grant* to *Jacob Rumph*, the *letter of attorney* from *Rumph* to *Harper*, the *lease* and *release* executed by *Harper* to *Hall*,) and then stated that *Hall* and wife, in consideration of five shillings, granted to *Morris* and *Nicholson* the said tract, piece or parcel of land, containing 150,000 acres, as granted to *Hall* as aforesaid. The deed contained *covenants* that *Hall* had an estate in fee simple in the land, and good right to sell, &c. and also contained a *warranty* against former and other gifts, &c. and for further assurances, &c.

The plaintiff also produced in evidence the admissions of the defendant in the paper first stated, that he received, as the consideration for the said 150,000 acres of land, the sum of 20,000 dollars in notes of *Morris* and *Nicholson*, as specified in the agreement

hereinafter referred to, bearing date the 15th of No-vember 1794, between *Wade Hampton* and *John Hall* of the one part, and *Morris* and *Nicholson* of the other part; and he further read in evidence the agree-ment last mentioned, and the several indorsements thereon, viz. "*Articles of agreement* indented, made and agreed upon, the 15th day of November 1794, between *Wade Hampton* of," &c. "and *John Hall*, of," &c. "of the one part, and the honourable *Robert Mor-ris* of," &c. "and *John Nicholson* of," &c. "of the other part. Witnesseth, that for the consideration hereinafter covenanted to be paid to the said *Wade Hampton* and *John Hall*, by the said *Robert Morris* and *John Nicholson*, they the said *W. Hampton* and *J. Hall*, for themselves, their," &c. "do covenant," &c. "to and with the said *Morris* and *Nicholson*, their heirs and assigns, that they the said *W. Hampton* and *J. Hall*, or either of them, shall and will within ten days from and after the date hereof, by good and suf-ficient deed or deeds of conveyance and assurance in the law, with general warranty, well and sufficiently grant, convey and assure, unto and to the only proper use and behoof of them the said *Morris* and *Nicholson*, their heirs and assigns, as they, or their counsel learned in the law, shall reasonably devise, advise or require, *nine hundred and four thousand and eighteen acres of land*, situate in the districts of *Orangeburgh*, *Camden*, *Cheraw*, and *Washington*, in the said state of *South Carolina*, together with the appurtenances, free and clear of all incumbrances whatsoever. In consideration whereof, the said *Morris* and *Nicholson* do hereby covenant, promise, and agree to pay unto the said *W. Hampton* and *J. Hall*, the sum or price of *one shilling* lawful money of *Pennsylvania* per acre, for each and every acre of the said lands, in the fol-lowing manner, to wit: The sum of £3750 money aforesaid, in notes, at the time of the execution of the aforesaid deeds of conveyance, and the balance or re-mainder in five equal annual instalments in one, two, three, four and five years thereafter, the three first instalments to be paid without interest, but the two

last sums or instalments to bear lawful interest, which is to be paid annually, and to give notes of hand of them the said *Morris* and *Nicholson*; that is to say, notes drawn by the one, and endorsed by the other of them, to the said *W. Hampton* and *J. Hall,* for said five annual instalments, payable in manner as afore-said. And the parties aforesaid do hereby further covenant," &c. "that whereas the lines of division of two tracts situate in *Orangeburgh* district, of each of which tracts a part is intended to be conveyed, to wit, a tract of 39,380 acres, whereof 20,000 acres are intended to be surveyed, *and a tract of* 281,197 *acres, whereof* 150,000 *acres are intended to be conveyed,* have not been run, that the said lines of division shall be run in such manner as by them the said *Morris* and *Nicholson,* or their agent, shall be directed, so as that out of the said 39,380 acre tract they, the said *Morris* and *Nicholson,* shall have the full quantity of 20,000 acres, clear of any other surveys, lying within the bounds of the said whole tract; *and that out of the said* 281,197 *acre tract, they the said Morris and Nicholson shall have the full quantity of* 150,000 *acres, clear of any other surveys, lying within the bounds of the said whole tract.* Further, that within *eight months from and after the date thereof,* actual resurveys shall be made of the whole of the aforesaid 904,018 acres of land, which is now intended to be conveyed, and that if upon such resurveys being completed, it shall appear that the lands *actually* conveyed to the said *Morris* and *Nicholson* shall fall short of the said quantity of 904,018 acres, they the said *W. Hampton,* and *J. Hall,* shall and do, within six months next after the same being ascertained, by like conveyances as aforesaid, convey to the said *Morris* and *Nicholson,* in lieu of such *deficiency,* an equal quantity of other lands, as shall be certified to the satisfaction of the said *Morris* and *Nicholson,* to be equal in quality and goodness to those falling short: But if it shall appear that the said lands overrun the said quantity of 904,018 acres, clear of all interferences whatever with other lands, then the said *Morris* and *Nicholson* shall pay the said

*Hampton* and *Hall* for such overplus, at the same rate, in the same manner, and the same terms, as herein before mentioned and appointed for the said quantity of 904.018 acres. Further, *that all the necessary expenses of making such resurveys shall be equally borne and paid by the said parties hereto, each party paying one moiety thereof; but that the expenses attending the running such lines of division be solely borne and paid by the said Hampton and Hall.* And further that the said *Hampton* and *Hall* shall and do within eight months from and after the date hereof, procure and furnish to the said *Morris* and *Nicholson* the following instruments of writing relating to the aforesaid lands, and which have not yet been furnished by them, to wit: "Original grant," &c. "The necessary certificates from the state courts, &c. to shew that there are no mortgages, judgments, executions, &c. against the said *Wade Hampton*, whereby the title to any of the said lands can or may be affected," &c.—"*and like certificates from the federal courts respecting mortgages, judgments, executions, &c. against all the persons through whom the titles to the aforesaid lands have come,*" &c. "For the true and faithful performance of all and singular the covenants and agreements herein contained, the said parties bind themselves, their heirs, &c. each unto the other, firmly by these presents, in the penal sum of £150,000 money aforesaid, to be paid by the party delinquent to the party observant. In witness," &c. Signed and sealed by *Hampton, Hall, Morris* and *Nicholson*—and thus endorsed, viz. "We do certify, that in fulfillment of the contract above mentioned, the following title papers have been received by us from Doctor *John Hall*, viz. *Exemplification* of a grant," &c.—"*Certificate* court common pleas *Orangeburgh* district, dated 15th September 1794, respecting *John Bynum, Jacob Rumph, John Hall*," &c.—"*Certificate* same court, same date, respecting *Wade Hampton*," &c. "*Account* Col. *Wade Hampton* to *John Bynum*, Dr. for resurveys, &c. made in 1795, amounting to $1714 81. *Account*, Col. *Wade Hampton* to *William Cato*, Dr. for resurveys, &c. made

in 1795 and 1796, amounting to 126*l* 5*s* 8*d*, So. Car. sterling. We also acknowledge to have received of the said Doctor *John Hall* $27,647 61, being a part of the notes issued on account of this contract, amounting to the sales of 207,352 acres of the within land, which had been held as a pledge for certain purposes as expressed in the receipt for the deposit, a copy of which is annexed, as a compensation for any such deficiencies should any there appear. Witness our hands, *Philadelphia*, May 27, 1800." Signed and sealed by *Morris* and *Nicholson*.

Copy of the receipt above referred to: "One note dated 20th November 1794, *Nicholson* to *Morris*, payable in four years, with interest, endorsed by *Morris* for 4,608 dollars. One note, same date, *Morris* to *Nicholson*," &c. The whole amounting to $27,647 61. "Received *Philadelphia* November 21, 1794, from *Wade Hampton*, of *South Carolina*, Esq. and *John Hall*, of *Philadelphia*, Esq. the above mentioned nine notes of hand, amounting to 27,647 dollars and 61 cents principal, which I am to deliver to them, or their order, (casualties by fire and other unavoidable accidents only excepted,) in moieties—one moiety to each, whenever they shall have furnished and delivered to *Robert Morris* and *John Nicholson*, Esquires, the following instruments and documents, to wit: *Original grant*," &c. "*Original conveyance*," &c. "The necessary *certificates* from the state courts," &c. "to shew that there are no mortgages, judgments, executions, &c. against the said *Wade Hampton*, against *John Anderson*, *William Tate* and *John Hampton*. And also like *certificates* from the federal courts, testifying that there are no mortgages, judgments, executions, &c. against the said *Wade Hampton* and *John Hall*, or against *Robert Stark, jun. Jacob Rumph*," &c. "whereby the titles to 904,018 acres of land, or any part thereof, which by the said *Wade Hampton*, *John Hall*, and *William Tate*, was on the 17th instant granted and conveyed to the said *Morris* and *Nicholson*, can in any wise be affect-

ed.   Witness my hand to two receipts of the same te-nor and date.

(Signed)          *Garrett Cottringer.*"

These indorsements were admitted, the agreement being the same mentioned in the paper of admissions, and remaining in the possession of the defendant. And it was also admitted, that it contracts to sell the land, for the price of which this suit is brought, and describes the same as 150,000 acres of land, intended to be conveyed out of a larger tract of 281,197 acres. The plaintiff also produced and read in evidence to the jury, another original agreement, dated the 27th of November 1794, between *Hall, Hamp-ton,* and a certain *Gideon Dennison* by *Hall* his attorney, the execution of which was admitted; and it was also admitted that this agreement in part relates to the land for the price of which this *suit is brought.* It was as follows: *Articles of agreement* indented, made and agreed upon, this 27th day of November 1794, between *Wade Hampton,* of" &c. "of the one part, and *John Hall,* of," &c. "as well for himself as for and in behalf of *Gideon Dennison,* of," &c. "of the other part.   Witness, that the said parties hereto, lately made sales of divers tracts of land lying in the state of *South Carolina,* to *Robert Morris & John Ni-cholson,* of." &c. "which said lands were conveyed to the said *Morris & Nicholson* on the 17th of this pre-sent month, in the following manner, to wit," &c. "the quantity of 150,000 acres, situate in *Orangeburgh* district, in and by one other deed of indenture also executed by the said *John Hall* and *Eliza Ann* his wife; the quantity of," &c. "in all the sales of which before mentioned lands the said *Wade Hampton* is in-terested and concerned in one half part the amount of the same, and the said *John Hall* and *Gideon Den-nison* in the other half part thereof.   Now the said parties hereto, do each for himself, his heirs," &c. "mutually covenant," &c. "to and with the other par-ty, his executors," &c. "that if any loss shall here-after be sustained by either of the said parties by means of any deficiencies," &c. "to said lands, or any

part thereof, or by reason or means of any other un-
foreseen cause relating to the said lands, or any part
thereof, all such loss or costs." &c. "shall be borne
and paid, the one moiety thereof by the said *Hampton*,
his heirs," &c. "and the other moiety thereof by the
said *Hall* and *Dennison*, their heirs," &c. "Further,
if any benefit or profit should hereafter accrue to and
be received by the said parties or either of them, for
or on account of the said land, by reason of any of
the said tracts overrunning the quantity for which the
same were sold, such monies shall be divided between
the said parties, in the same proportion as aforesaid.
For the true and faithful performance of all and sin-
gular the covenants and agreements herein contained,
the said parties bind themselves, their heirs," &c.
"each unto the other, firmly by these presents, in the
penal sum of $100,000, to be paid by the party de-
linquent to the party observant. In witness," &c.
Signed and sealed by *Hampton* and *Hall*, and by *Hall*
for *Dennison*. The plaintiff also produced and read
the deposition of *Andrew Summers*, (which was ad-
mitted to be read in evidence,) as to the value of the
notes of *Morris* and *Nicholson*. It states, that in the
year 1794, in the months of October and November,
the notes of *Morris* and *Nicholson* were at *par*. In
December the value in the market was something less
than *par*, but how much the deponent could not say
with accuracy. In the year 1795, January 22d, 26th,
27th, and February 4th, 13s 4d for 20s. of notes at 23
months. February 27th, 12s. for 20s. of notes at 22
months. April 16, 10s 8d for same, at 31 and 19
months. September 24th, 9s. for same, at 15 months.
November 6th, 7s 6d for same, at 20 months. De-
cember 4th, 6s 8d for same at 19 months; and Decem-
ber 24th, 6s. for same, at 23 months. The plaintiff
further offered in evidence to the jury, to prove by
their production on the 1st of March 1803, and by
their production on this trial by the defendant, as evi-
dence in his behalf, that the three papers dated the
20th of December 1794, and hereinafter mentioned,
were at that time, and ever since have been in the

possession of the defendant, and were by him produced and read to the jury at the time of the trial. He also read to the jury a letter from the plaintiff to the defendant, and received by him, dated January 12th, 1800, viz,  *Philadelphia*, January 12, 1800.

"I had the pleasure yesterday, my dear sir, of receiving your letter of Nov. 26th, enclosing one to *Jones* and *Clarke*, which I shall deliver to-morrow. Until I hear from them I can say nothing further in answer to that letter, except that I can now foresee nothing which ought to prevent me from attending to the professional case alluded to by you.

"I did receive your letter of Nov. 3d before I left *Baltimore* to attend congress; but as I had it not in my power to give any satisfactory answer to the only part of it which required one, till my arrival here, I postponed it till that time. I then applied to the proper offices on the subject of major *Hutchinson's* claim," &c. Bond was in *Maryland* when I came up; and did not arrive here till after my departure for *Baltimore*. I have not yet spoken to him on the subject of the note and mortgage. It is my intention to pay the money; but I think it will be safer for you in the hands of *Jones* and *Clarke*; and I shall therefore lodge it with them as soon as I can make it up.

"You will recollect, that in 1794 you effected a large sale of lands to *Morris* and *Nicholson* at one shilling *Pennsylvania* currency per acre, in their notes, payable at various periods; and that among these lands there was one tract of 150,000 acres, the half of which belonged to me. My proportion of the notes, which were at that time in full credit, amounted of course to £3,750 P. C. This sum remained undivided in your hands. Considering you in the light of a friend, in whose hands my interests would be safe, I did not question the sufficiency of the reasons which you assigned for the detention; although the deprivation of those funds brought on me very serious embarrassments, the effects of which I still feel. They are indeed very heavy. I have supposed that

the whole of the notes derived from the general sale in question had died in your hands by their depreciation; and in that supposition I submitted patiently to what I supposed a common loss. I now owe it to candour to say, that a very different state of facts, on that head, has been suggested to me. It has been suggested to me, that the whole, or a very large part of the notes in question, was employed by you in the winter of 1794-5, in the extensive purchases which you made about that time. In this case you will perceive, that I should be entitled, in law as well as justice and fair dealing, to an account for my proportion of all that was invested at the rate at which you passed them away. I resolved not to listen to this suggestion, much less to believe it, till I should have asked you the true state of the fact. I therefore beg the favour of you to inform me, whether any, and what part of the notes arising from the general sale in question, was invested by you, at what time, and at what rate? In full confidence that your answer will be entirely satisfactory, I remain," &c

The plaintiff, to prove that the defendant actually received from *Morris* and *Nicholson*, to whom the lands aforesaid were sold, the sum of $4351 67, in money, in part of the notes received from *M.* and *N.* for the sale of the lands in the year 1794, read the deposition of *Joshua B. Bond.* This deposition states, that the deponent, early in 1795, became the agent of the defendant in *Philadelphia*, for collecting money due to him in that city, and for transacting his money concerns there, and continued to act as such until the year 1803. He believed the defendant had no other agent there during that period. About the 1st February 1795, he received from the defendant two drafts, drawn by the defendant in the deponent's favour he believes, one upon *Robert Morris*, and the other upon *John Nicholson*, each for $4180 50, at sixty days sight; these drafts were transmitted to the deponent by the defendant for the sole purpose of collecting

May 1805.

Harper
vs
Hampton

the money for him. The drafts were accompanied by a letter from *Morris* and *Nicholson* addressed to the defendant, authorising him to draw as he had done. The letter marked A, dated *Philadelphia* Nov. 20, 1794, from *M* and *N* to the defendant, is exhibited, and is as follows: ‹‹In the arrangements made for the payments of the amount of our purchase of lands from you, there remains in our hands a sum of $8377, for which we hereby agree to pay your drafts in the following mode: Upon *Robert Morris* for such sums as you may find convenient, at not less than sixty days sight, to the amount of $4188 50, and upon *John Nicholson* in like manner, to the amount of $4 88 50; and your drafts, so drawn, will be punctually paid by us respectively. It being however agreed and understood between us, that you will not pass these drafts sooner than your necessities require.'' &c. The deponent states, that this is the letter, or a duplicate of the letter, which was sent to him by the defendant with the drafts. The body of the letter is in the hand writing of *R. Morris*, the signature *Rob. Morris* is in his Mr. *Morris's* hand writing, the signature *John Nicholson* is in his Mr. *Nicholson's* hand writing, and the direction on the back of the letter is in the hand writing of *Garrett Cottringer*, then clerk to *Robert Morris*. That the drafts were presented to *M.* and *N.* and accepted, but at maturity were both dishonoured and protested for nonpayment. That after much exertion, and much dunning, the deponent received at different times from *John Nicholson*, the sum of $2508 37, in part. That he took bills on *London* for the balance, which were dishonoured and protested. That suits were brought on them, and before judgments were obtained, *M.* and *N.* became so desperate in their affairs, that nothing could be obtained from them, and that nothing was received. The deponent knew nothing of the sale of lands by the defendant to *M.* and *N.* When the defendant sent the deponent the drafts before mentioned, he also sent him, to be collected, notes drawn by *Morris* and endorsed by *Nicholson*, and drawn by the latter and endorsed by the former,

to a very large amount, the precise sum he cannot tell, but believes to the amount of $10,000, probably much more.   These notes remained with the deponent until the latter end of the year 1795, when there being very little prospect of collecting them, or disposing of them but at a very great loss, the defendant took out of the deponent's hands many of them—the amount, &c. he does not recollect.   Two of the notes thus sent to the deponent, remained in his hands until the year 1803, when he returned them to the defendant; of these two notes one of them was drawn by *Morris* and endorsed by *Nicholson,* for $4608, dated 20th Nov. 1794, payable twelve months after date, and the other drawn by *Nicholson,* and endorsed by *Morris,* for $2016 67, dated the 17th of November 1794, payable 36 months after date.   Upon this last note nothing was ever paid—the whole of it still remaining due.   Upon the note for $4608, the deponent received from *Morris, Jared Ingersol's* note for $3000, which last note the deponent sold for $2343 30, and accounted for that sum with the defendant.   The balance of $1608 still remains due and unpaid.   Upon the back of this note for $4608, *Garrett Cottringer* has thus endorsed: "Received Janry. 9, 1796, of *R. Morris,* $443 25, being balance arising on a note of *Jared Ingersoll's,* due 20th March next; also said *Ingersoll's* note, dated 20th Nov. 1795, at 8 mo. due 20th July next, for $3000, on acct. of the within note"—by this it would seem, that both these sums were paid on that note; but that is not the case, in this there is a mistake, the first mentioned sum of $443 25 was paid, in fact, upon another note, the property of the deponent.   The paper marked B exhibited, is a bill of exchange dated *Philadelphia,* June 20, 1796, for $1805 55, drawn payable 8th October then next, by the plaintiff, in favour of Messrs. *Pragers,* & Co. on *Joshua B. Bond,* the witness.   The deponent states, that it is the original draft, and was accepted by him at the request of both plaintiff and defendant.   It was the defendant who induced him to accept it, and guaranteed the deponent from loss for doing so.   It was accepted

Harper
vs
Hampton

on the defendant's credit.    The draft was paid by the deponent.    The paper marked **C** exhibited, is a bill of exchange drawn by the plaintiff at *Philadelphia*, on the 20th June 1796, for $1850, on *Johnson Hagood* of *Charleston*, at three months, in favour of *Joshua B. Bond.*    The deponent states, that this is one of the set of bills drawn by the plaintiff in his favour—the object in giving it was to raise funds to meet the deponent's acceptance for him before mentioned.    It was dishonoured and sent back protested, and has never been paid.    The plaintiff promised payment to the deponent.    It was however paid by the defendant, and the plaintiff repaid to the defendant a part of the money, which passed through the deponent's hands.    The plaintiff knew, as the deponent believes, that he was the defendant's agent.    Never heard the plaintiff allege or pretend at any time, when he called on him for payment of the money due on the draft, before or after the defendant had paid the deponent, that the defendant owed him money, or held in his hands any funds belonging to him.    Early in 1797 the notes of *M.* and *N.* became of no value at all in the city of *Philadelphia.*

The defendant then read in evidence to the court and jury, to support the issues on his part, all the papers produced and read by the plaintiff, and herein before stated, except the letter from the plaintiff to the defendant dated 12th January 1800.    He also read in evidence an act of the general assembly of the state of *South Carolina.* passed on the 10th of May 1794, entitled, "*An act to close the land office for and during the term of four years, under certain limitations, and for other purposes therein mentioned.*"    The *third* section of that act is as follows, viz.    "And whereas since the passing an act, entitled, *An act for establishing the mode of granting the lands now vacant in this state, and for allowing a commutation to be received for some lands that have been granted,* passed the 19th day of February 1791. divers grants of large tracts of land have been obtained, which included one or more surveys which have not been elapsed, the pro-

perty of others, without taking notice of or designating the same in their plots, and without obtaining the consent of the said proprietors, and without their knowledge: And whereas," &c. "Be it enacted," &c. "that the said surveys were made in violation of the instructions given to the deputy surveyors in this state; that the said grants have been obtained contrary to the intention of the legislature in establishing the mode of granting the lands, now vacant in this state; that the governor must have been deceived when he signed the same; and that on its being proved in the manner before enacted, to the satisfaction of any district court and jury within whose jurisdiction the land lies, that such grants actually contained within their limits one or more settlements, the property of others under former surveys, without taking notice of or designating the same in their plots, and obtaining their consent, (where such consent could have been obtained,) to run the same, the court shall declare the grants to be fraudulent, and the same shall be void to all intents and purposes." The defendant further read in evidence, the grant from the governor of *South Carolina* to *Jacob Rumph*, dated the 5th of August 1793, for 281,197 acres of land, (which is admitted to embrace the land, for the price of which this suit is brought,) and the plot or survey upon which that grant issued. "The State of *South Carolina*, to all to whom these presents shall come, greeting: Know ye, that in pursuance of an act of the legislature, entitled, "*An act for establishing the mode of granting the lands now vacant in this state, and for allowing a commutation to be received for some lands that have been granted*, passed the 19th of February 1791, we have granted, and by these presents do grant unto *Jacob Rumph*, Esq. his heirs and assigns, a plantation or tract of land, containing *two hundred and eighty-one thousand one hundred and ninety-seven acres*, surveyed for him the 19th of July 1793, situate in *Orangeburgh* district, in the fork between north and south *Edisto* rivers, bounded," &c. "having such shape, form and marks, as are represented by a plot hereunto annexed, together with all

woods," &c. "to have and to hold the said tract of
*two hundred and eighty-one thousand one hundred and*
*ninety-seven* acres of land, and all and singular," &c.
"unto the said *Jacob Rumph*, his heirs and assigns, for
ever, in free and common soccage. Given," &c. The
*plot* is annexed, of the land surveyed 19th July 1793,
and containing 281,197 acres, for *Jacob Rumph*. The
defendant also read in evidence the deposition of *John
Bynum*, Esquire, surveyor general of *South Carolina*.
The deposition states that the deponent was applied to
by *Hampton*, in the spring of 1795, to resurvey cer-
tain lands in the state of S. C. which had been sold
in November 1794 by *Hampton, Hall* and *Dennison*,
to *Morris* and *Nicholson*, and that he did undertake to
resurvey part of the lands so sold, and did actually
resurvey the same. That he was requested by *Hamp-
ton* to resurvey the tract of land granted to *Rumph*
for 281,197 acres, but declined the undertaking. His
reasons for so doing were, that he had understood
that the inhabitants residing within the limits of that
grant were much dissatisfied, and had expressed a
determination not to permit their lines to be closed or
run through or upon, nor to permit the resurvey to
be made. And, as he conceived it both a difficult and
laborious undertaking, even with the aid and assist-
ance of the inhabitants, there being a very great
quantity of older granted land within the said patent,
and mostly in small tracts, he declined making the
resurvey, and recommended *Alexander Bolling Stark*
as a proper person to make the resurvey, he being
acquainted with the inhabitants residing on it. The
deponent is surveyor-general of the state of S. C.
and was commissioned as such on the 18th of Febru-
ary 1803. He does not know how much vacant land
the said survey and grant contains, after making the
deductions of such lands as people residing within the
limits of the survey, had, before the 22d of August
1794, surveyed for the purposes of settlement or cul-
tivation, or by way of addition to their plantations,
and such lands as *David Coalter* had surveyed in his
own name, before that day, within the limits of

*Rumph's* survey—and such lands in such survey as had been patented to others previous to the 5th of August 1793. But from all the information which the deponent had been able to obtain from the records of the surveyor-general's office, and other sources, he is confident that the quantity of vacant land contained in the said survey, after making the aforesaid deductions, does not exceed 120,000 acres; but is of the belief that it contains 10 or 15,000 acres less than that quantity. He is induced to this belief, as well from the quantity of land covered by older surveys within the limits of the said large survey, as from an opinion that the tract of country comprised within the lines and limits of the said large survey does not contain the aggregate number of acres specified in said survey and grant. The defendant, to prove that the plaintiff was sensible of the danger that the patent granted to *Rumph* for the said 281,197 acres might be vacated, read to the court and jury an agreement between the plaintiff and *Rumph,* dated the 13th of November 1794, which it is admitted relates to the lands mentioned in the agreement of the 25th of August 1794: "*South Carolina.* Memorandum of an agreement entered into between Col. *Jacob Rumph* and *Robert Goodloe Harper,* at *Orangeburgh* on the 13th of November 1794." This agreement recites the grant to *Rumph,* the agreement between *Rumph* and the plaintiff, the sale to *Hall,* the delivery of the deed to the defendant, and also that *Rumph* did authorise *David Coalter* to receive £375 out of his part of the monies to arise from the said sale, taking from *Coalter* a note for £150. And it was agreed between the parties— "*First.* That *Rumph* shall relinquish to *Harper* all his right to the moiety of monies to arise from the above mentioned sale, deducting first the £375 paid to *David Coalter,* and shall also convey to *Harper* all his *Rumph's* title, interest and estate, in the remainder of the said lands granted in the fork of *Edisto,* which conveyance is to be without warranty, and will extend to such lands only as were vacant at the time

when the said grant bears date, and as are not ex-cepted in the former agreement between the said par-ties. *Secondly.* In consideration of the foregoing, *Harper* shall give *Rumph* good bond, with sufficient security, to indemnify him against any warrant, claim or demand, of any kind, which may hereafter be made on him on account of the above mentioned sale and conveyance, or of any other sale to be here-after made by *Harper*, of any part of the said lands, and shall moreover pay *Rumph* £500 sterling. And *Thirdly.* *Harper* shall make no demand on *David Coalter* for any part of the £375, and shall settle that matter with Col. *Hampton*, so as to pre vent him from making any such demand. Col. *Rumph* is to allow *Coalter's* note for £150, in part payment of the above mentioned £500. And the said £500 is not to be paid or demanded should the grant be set aside by the legislature or courts of this state—but in that case Col. *Rumph* is to be indemnified in manner aforesaid." This agreement was signed and sealed by *Rumph* and *Harper.* The defendant also read in evidence three papers, dated the 20th December 1794, all in the hand writing of the plaintiff, except the signature, *Wade Hampton*, to two of them, as a subscribing wit-ness, which is in the hand writing of the defendant; two of which three papers relate to the agreement of the 13th of November 1794, for purchasing the in-terest of *Rumph* in the 150,000 acres of land, for the price of which this suit is brought, and the other be-ing a paper which the plaintiff required *Rumph* to sign and give to him the plaintiff. These papers are exhibited; *the first* is a bond from the plaintiff to *Rumph*, dated 20th December 1794, and conditioned for the payment of £350 money of S. C. on the 1st June then next—signed and sealed by the plaintiff, and witnessed by the defendant. *The second paper* is dated *Orange* County, December 20, 1794, and is as follows: "*Robert Goodloe Harper* having executed and delivered to me a bond of this date, conditioned for the payment of £350 sterling on or before the 1st day of June next, I do hereby acknowledge, that no part

of the said bond is to be demanded or to become due till the grant made to me for 281,197 acres of land, in the fork of *Edisto*, shall have been properly and sufficiently resurveyed and confirmed; and that if the said grant should be set aside by the legislature, or declared void by the courts of justice, the said bond is to become void. Witness my hand and seal the day and place above mentioned." But it was neither signed nor sealed. *The third paper* is a bond from the plaintiff, with a blank for the name of another person, to *Rumph*, dated the 20th of December 1794, for carrying into effect the agreement between *Harper* and *Rumph* of the 13th of November 1794, herein before stated—signed and sealed by *Harper*, and witnessed by *Hampton*. Which proposed purchase by the plaintiff from *Rumph*, mentioned in the last mentioned four papers, was however never made complete or carried into effect. The defendant also read an order from the plaintiff upon the defendant, dated the 9th of May 1795, which the defendant accepted and paid: "Sir, Please to deliver to Dr. *John Hall* or his order, one thousand dollars, in notes of *Morris* and *Nicholson*, payable two years after date, and place to the account of my part of lands sold to them." The defendant also read several letters to him from the plaintiff, viz. One dated *Charleston* January 9, 1795—In which the plaintiff stated, that he had given a bond, with Dr. *Ramsay* as his security, and he was anxious to make such arrangements as would place him beyond the danger of being called on; and that could the funds belonging to him in the defendant's hands be appropriated immediately, the business might easily be settled; but particular circumstances preventing that, all that he could do for the Doctor's security, was to request, that in case any accident should happen to the plaintiff, the defendant would apply so much as should be sufficient out of those funds to the discharge of the bond in question. *Another letter*, dated *Charleston* January 9, 1795; and that part of it having any relation to the question in dispute is as follows: "The suddenness of my departure has thrown me back

in some pecuniary arrangements, which it is of im-portance to my feelings to make. Mr. *Hagood,* my agent in *Charleston,* who is charged with these affairs, may perhaps have need of your assistance. I have directed him to call on you with an assurance that if 2 or £300 should be necessary for my affairs, and conveniently in your power, your aid might be relied on." *The depositions* of *Johnson Hagood* and *David Ramsay,* were also read by the defendant. They stat-ed, that nothing was received of the defendant in con-sequence of the preceding letters. Also *another let-ter,* dated *Philadelphia,* March 28, 1795. The part of this letter which seems to be material is as follows: "*Morris* and *Nicholson* are still low, and it is doubtful when they will rise, if ever. I myself have no doubt that they will. Their land scheme goes on, though slowly, and the ultimate success of it is very proble-matical. It is impossible almost *to* give any opinion on the subject, or even to form one." Also *another letter,* dated *Philadelphia,* August 9, 1797. In this letter the plaintiff stated, that he had been called on by Mr. *Bond,* relative to some money transactions between him and the defendant, and which he had sup-posed had been settled by the sale of property in *Charleston.* He expressed his regret at not being able at that time to pay the money which he owed the de-fendant, or even the balance due on *Bond's* affair, and says, "the resource of *Morris* and *Nicholson's* notes has entirely failed." Also *another letter* dated the 13th of August 1797, inclosing a mortgage executed by the plaintiff to the defendant, of a tract of land, &c. also the *mortgage* above alluded to, dated 13th Au-gust 1797, of 650 acres of land, at *Lawrens's* court-house, in the county of *Lawrens,* in S. C. purchased of *Sa-muel Saxon,* to secure the payment of $922 80 with interest from the 12th March then last, for which a note is given in twelve months from the date. Also a *note* of hand of the same date for $922 80 with in-terest from the 28th March then last, payable to the defendant 12 months after date. Also *another letter* dated *Baltimore,* September 26, 1799, in which the

plaintiff mentioned his intention of fixing his residence in *Baltimore,* &c. that he had an application for his place at *Lawrens,* which Mr. *Hagood* was authorised to sell, securing as a prompt payment the sum due to the defendant, and that should it not be paid in that way, his profession, he trusted, would soon furnish him with other resources. The defendant then read the affidavit of the plaintiff in this cause, filed by him, on the 13th of October 1802, viz. *Robert Goodloe Harper,* the plaintiff in the above action, being duly sworn, did depose and say, that on or about the 25th of August 1794, *Wade Hampton,* the defendant in the said action, did sign, execute and deliver to this deponent, a writing bearing date on that day, and in the following words and figures, viz: [Here follows the agreement between *Hampton* and *Harper.*] "And the deponent further saith, that the said writing is now in his possession; that the name *W. Hampton* thereto subscribed, is the signature of the defendant. That the defendant did make sale of the said land to the said *John Hall,* at the rate and price of one shilling, *Pennsylvania* currency, an acre, equal to one shilling current money of *Maryland,* an acre, which payment was made by the said *Hall* to the defendant in promissory notes of *Robert Morris* and *John Nicholson* of *Philadelphia,* and was received by the defendant some time in the months of September, October or November 1794; that the notes were payable at different periods, and at the time of their being so received by the defendant, were in such credit, and of such value, as to pass currently in payments and purchases in the city of *Philadelphia,* and elsewhere within the *United States,* at their nominal amount, with a discount of the legal interest six per centum, till the time of their becoming due. That the sum so received by the defendant for the 150,000 acres of land, mentioned in the said writing, was £7,500 *Pennsylvania* currency, equal to the same sum of current money of *Maryland.* That one half of the said land belonged to this deponent, by virtue of an agreement in writing between him and *Jacob Rumph,* in the

above mentioned writing named; the other half being the right and property of the said *Rumph*, from whom this deponent hath understood and believes, that it was afterwards purchased by the defendant. That this deponent's demand against the defendant, consequently extended only to one half the above mentioned notes, or £3750 current money, with interest from the time when the said payment was received by the defendant as above stated. And that this deponent hath not, directly or indirectly, received from the defendant any of the said notes, or any satisfaction, compensation or value therefor, of any kind, except the sum of one thousand dollars, part of the notes which he assigned to *Hall* for a valuable consideration sometime in the summer of the year 1795, and for which he gave *Hall* an order on the defendant, the fate of which this deponent does not know, but which he considers as an extinguishment of his demand against the defendant to the extent of $1000 of the notes. And this deponent further saith, that the defendant resides without the limits of this state, to wit, in the state of *South Carolina*; and that this deponent doth not know or believe that the defendant is seised or possessed of any real or personal property within this state."

Whereupon the defendant prayed the opinion of the court, and their direction to the jury, that upon the whole of the evidence given in this cause, the plaintiff is not entitled to recover upon either of the counts in the declaration.

*Johnson,* for the defendant, contended that the evidence was not sufficient to authorise the jury to give a verdict for the plaintiff. That if there was any cause of action at all it depended on a special agreement with the defendant, signed by the plaintiff for himself and Col. *Rumph*. The plaintiff is then to be viewed in one of two capacities, in neither of which can he sustain the action.

1. He is either a partner with Col. *Rumph*, or

2. He is his agent; and

3. Upon the whole evidence there is no cause of action.

1. It does not appear that Col. *Rumph's* interest is assigned. He gives the plaintiff one half if he sells the land. The money was to be raised, and each was mutually interested in the sale, and having a mutual interest, one cannot sue without the other. *Gil. L. E.* 186. Where there is a partnership demand, all the partners should join, for the contract and undertaking is joint; and if one partner only brings the action, the defendant may take advantage of it at the trial, and nonsuit the plaintiff. *Esp.* 117. 2 *T. R.* 282.

2. If the plaintiff is the agent of Col. *Rumph*, the action cannot be supported. The contract did not preclude Col. *Rumph* from carrying into effect any sale made by the plaintiff. A factor may support an action for the price of goods, which as factor he has sold; for the promise shall be presumed to be made to him. *Esp.* 107. But there is a distinction in law between factors and other agents. Factors may sue in their own name, other agents cannot. *Esp.* 109. The contract between the plaintiff and defendant cannot alter the nature of Col. *Rumph's* right. This contract, says the defendant, is to account with the plaintiff. It refers to the contract with *Rumph*, and to the letter of attorney.

3. There is no cause of action any where. There is a *condition precedent* in the agreement between the plaintiff and defendant. Certain things are to be done by the former before a demand can be made by him. Counter security was to be given by him to the defendant for all warranties and guarantees that the defendant might enter into. The plaintiff had no right to call on the defendant until he had given the counter security, and consequently not having done so, he cannot sustain this action. It would be compelling the defendant to resort to a suit to compel a counter security. They are not mutual and independent covenants—but the covenant to pay the money depended upon the giving the counter security, and this not being given, the defendant had a right to retain the money until it should be given.

*Mason,* on the same side. It appears that the legal title to the land was in Col. *Rumph,* and the equitable title to the money in the plaintiff as the attorney of *Rumph.* The power of attorney does not authorise the plaintiff to make the contract. He was not to appropriate the funds to his *own use.* If the plaintiff has made an unauthorised contract, it is void, and can give him no cause of action. He has secured the payment to himself, which he was not authorised to do. It is a sound and true principle of law, not to be controverted, that agreements in *pari materia* are to be all taken together, and to be considered as one agreement. The grant to Col. *Rumph* was issued subsequent to August 1794, but antedated to 1793. This is evident from the contract between the plaintiff and *Rumph* in August 1794, which states that the grant was not then obtained. The act of the legislature of *South Carolina,* passed in 1794, evidently takes in this grant. The *first section* of that law declares that there should be no future grants for above 500 acres—and that the land office should be shut up as to grants above that quantity for 4 years. The defendant was not bound to account for the money or notes received, until the counter security was given. The contract intended to give a future security upon the sale, if guarantees were entered into. It was a friendly act on the part of the defendant in selling the plaintiff's land, and he was to derive no benefit or advantage from it, and if he incurred a responsibility in the sale, he should be countersecured, and until he is he should not part with the funds in his hands. The *intended agreement* between the plaintiff and *Rumph* in November 1794, shews that they had fears as to the grant's being vacated. It does appear that the plaintiff has no cause of action, and therefore cannot recover.

*Key,* for the plaintiff. The plaintiff, by the agreement with Col. *Rumph,* is entitled to one half of the land, or if sold, to one half of the amount of the sales. A court of equity would compel a conveyance

from *Rumph,* to the plaintiff for one half of the land. The plaintiff's interest was a tenancy in common with *Rumph* in the land, and he might sell one half, independently of *Rumph.* The deed to *Hall* contains a general warranty, and nothing has been done by the defendant requiring a counter security. By the agreement between the plaintiff and defendant, the defendant is to pay to the *plaintiff* the amount of the purchase money. This court is not competent to declare a grant for land in *South Carolina,* void. The defendant sold to *M.* and *N.* lands of his own, granted at the same time the land was granted to *Rumph.* He knew or supposed the grants were valid —since if he had known or supposed they were void, it is to be presumed he would not have sold the lands so granted. In the agreement between the defendant and *Hall,* and *Morris* and *Nicholson,* there are no covenants creating any liability on the part of the defendant on account of the lands sold for the plaintiff. *M.* and *N.* were to run the line of division, and if they never run that line, the defendant says he is never to pay the plaintiff. The resurveys were to be made by *M.* and *N.*—and running the line of division is a resurvey. Notes were retained by *M.* and *N.* under the agreement to answer the deficiencies, &c. Their release shows they have no claim on that account. They acknowledge they have received compensation for all deficiencies, &c. The defendant has not shown that he gave the plaintiff any notice of his having entered into any guarantees, &c. or made himself liable or answerable in any way on account of the lands sold by him for the plaintiff. There is no guarantee in force against the defendant upon which an action can now or ever could have been brought. To excuse himself from paying the money, three things must be shown by the defendant: What was the counter security to be given for? If the money is withheld it is incumbent on the defendant to show what guarantee has been entered into by him, so as to justify his not paying it over. But there is nothing shown proving a guarantee. Papers have been produced, which the

defendant pretends prove his liability to be called on, viz. The deed from the plaintiff to *Hall;* the deed from *Hall* and wife to *M.* and *N;* and the agreement between the defendant, *Hall* and *Dennison.* These instruments of writing are all to be taken together, and there is no warranty in any of them to prove any guarantee whereby the plaintiff is bound. It is not pretended *M.* and *N.* ever run the lines of division, and the defendant was not liable to any expenses until the lines were run. Suppose the covenant did contain a liability on the part of the defendant—that liability has been discharged under the release from *M.* and *N.* it not being shown that *M.* and *N.* had parted with their interest, or that they had not a right to release. The release to *Hall* enures to the benefit of all the parties. If *M.* and *N.* had made sale of the lands, such sale did not affect the release. It was not a covenant real, but it was a personal covenant, and no deed has been shown from *M.* and *N.* of their having entered into any covenants. And supposing they had entered into any, they would be personal covenants only, and did not of course enure to the benefit of the defendant; and the discharge of *M.* and *N.* is valid, and is a complete release to *Hall* and the defendant. There is no liability, and could not be any, in the deed from the plaintiff to *Hall,* so as to operate upon the defendant. Under the articles of the 27th November 1794, all the parties agreed to gain or lose in equal proportions upon the whole sales, and if there had been a loss, and the whole loss had been on the 150,000, there was no liability on the part of the defendant.

As to the other objections, the plaintiff does not stand as a partner with Col. *Rumph.* There is no such thing as partners in land; that term is applicable to traders only.

*Johnson.* It is immaterial whether they were partners or tenants in common, the plaintiff cannot support his action. 1 *Com. Dig.* 12. *Co. Litt.* s. 315, 316.

*Key.* Partners in trade may give a discharge, but tenants in common cannot. In the case of partners one has as much right as the other to the whole for the purpose of selling. But in the case of joint tenants, or tenants in common, each sells his own interest, and neither can sell the whole. But the authority of the plaintiff to sell, and the sale and promise to pay him, authorises him to sue in his own name. An agent can sue in his own name. At all events, the plaintiff can sue for his share. A mortgagor cannot contradict the title of the mortgagee, so here the defendant cannot controvert the plaintiff's right to sue. In an action for use and occupation of land, the defendant cannot plead *nil habuit*, &c. so as to prevent his paying the rent. In the case at bar, whether the plaintiff had a right or not, the defendant is bound to pay, and he is estopped from controverting the plaintiff's right of action.

*Harper.* On the general issue the defendant objects to the plaintiff's right to recover, on four grounds:

1. That the plaintiff is in this case an agent and cannot recover in his own name, but ought to sue in the name of Col. *Rumph.* 1 *Esp.* 109.

2. That this is a joint claim or partnership between the plaintiff and Col. *Rumph*, and a separate action cannot be maintained on it. *Esp.* 117.

3. That the counts in the declaration vary from the agreement in two respects—1st. The counts speak of *payment* of money only, and the agreement speaks of *payment* or *securing* of payment. 2d. The count says, that the plaintiff was to indemnify, and the agreement states that the plaintiff and *Rumph* should indemnify. That these variances between the count and the evidence are fatal. *Esp.* 130, 139.

4. The deed mentioned in the agreement, and given in evidence, is not valid; therefore the defendant is not liable.

1. To the *first objection*, there are three answers. 1st. An agent, where he contracts in his own name, may maintain an action, because the promise is in-

MAY 1805.

Harper
vs
Hampton

tended to be made to him. *Esp.* 107. *Bull. N. P.* 130. 2d. The plaintiff is entitled to one moiety in his own right, and not as agent, and for that he may recover. 3d. Here is an express promise to pay the whole to the plaintiff, who therefore has the legal right to recover the whole; and as to the moiety is accountable to *Rumph* as a trustee.

2. To the *second objection*, that there is a partnership, or joint claim, it is answered, 1st. That it is not a joint claim, but separate rights to distinct moieties—In which case each may sue separately. *Esp.* 117. 2d. Here is an express promise to *one* to account with him singly; therefore he is not a partner with the other, but a trustee for him as to the moiety, and has the legal right to recover the whole. It is like the case of a surviving partner, and the executor of the deceased partner. *Esp.* 117. *Martyn and Crump. Salk.* 444.

3. To the *third objection*, the answer is, 1st. That a variance, to be fatal, must be in a part of the agreement material to be set forth. For it is a maxim that surplusage never can vitiate, and it cannot be error to allege that defectively, which need not be alleged at all. *Esp.* 140. *Bradburn vs. Bradburn, Cro. Jac.* 149. *Doug.* 15. 1 *T. R.* 447. 7 *Co.* 9. *Cro. Eliz.* 88. 3 *Burr.* 1586. It may be objected, that the contract is entire, and must be proved as laid—*Gwinnet vs. Phillips et al.* 3 *T. R.* 643.—And it may be admitted. This means only such parts of the paper as make an essential part of the ground of action. But if there be distinct contracts in the same paper, as here, or distinct covenants in the same deed, none but those *material to the support of the action* ought to be set out, or if set out need be proved. *Doug.* 665. The distinction which governs all the cases in the books is this—where there is a writing *material to* the action, making part of its substance, but not necessary to be specially set out, if the party undertakes to set it out, he must prove it strictly, because otherwise the defendant would be misled and deceived. But where it is not material to the action, as in the

case of separate covenants in the same deed, it need not be proved at all, nor alleged; and consequently no variance can be fatal. This reconciles all the authorities. The first variance here stated does not exist. The only one that exists is in stating the stipulations on the part of the plaintiff. But they are distinct independent stipulations, that need not have been set forth. They make no part of the contract on which the action is founded, but constitute a separate independent contract. The recital of them therefore is mere surplusage. It is answered, *secondly*, that the variance itself is immaterial, and therefore does *not* vitiate. *Esp.* 129, 130. The reason why there must be no variance is, that the defendant ought to have *notice* of the demand against him. Every substantial important part of the agreement, every material stipulation, must be set out in the count, otherwise the suit would be on one contract, and the recovery on another. *Esp.* 129, 130. 1 *T. R.* 134, 447. *Bull.* 145. *Esp.* 138, 139. 1 *Stra.* 22, 697. 2 *Stra.* 806, 817. *Ld. Ray* 583. 3 *Wils.* 1. 2 *Stra.* 793. 1 *Raym.* 450. In all these cases the omission was material, and varied the substance of the contract. Here it does not. The true meaning of the contract is, that the defendant shall have a sufficient indemnity and counter security, by means of the plaintiff and *Rumph*, or one of them. This was the substance, and this is substantially alleged in the 2d and 4th counts. But *lastly*, all these objections go upon a fallacious idea, viz. That where there is a special agreement *laid* in the declaration, and not proved as laid, the action cannot be supported on general counts. This was formerly said to be the rule, but there is but one case to that effect, (*Weaver vs. Boroughs*, 1 *Stra.* 648,) on which there are several observations to be made. 1st. It was merely a point ruled at *nisi prius*, and never solemnly adjudged. 2d. It goes no further than a *quantum meruit*, where there is a special agreement, but does not touch the case of a general *indebitatus assumpsit*, or a count for money had and

received, paid, laid out and expended, &c. *Bull.* 139. 3d. This case, and the principle contained in it, have been formally and solemnly overruled. *Bull.* 139, 140. *Doug.* 651. The rule established in these cases is, that "where the evidence is sufficient to warrant the plaintiff's action on the *general counts,* supposing no special agreement had been laid in the declaration, the plaintiff shall be permitted to recover on such general count, though there be a special agreement laid, and whether he attempt to prove such special agreement or not." *Bull.* 140. *Doug.* 651. The 7*th and* 8*th counts* are *indebitatus assumpsit,* and *quantum valebant* for lands sold by the plaintiff to *John Hall,* at the defendant's request, and for his use. The evidence is sufficient to support these counts. There is also a count for *money had and received* which the evidence will support. Money had and received will lie for negotiable notes. *Cowp.* 179. *2 Blk. Rep.* 828. So it will lie where the value of the proceeds of one man's property has come into the possession of another, who has no right to retain it; although that value were not received in money, but in something else. *Cowp.* 371, 376. *Evans's Essays,* 2. The present case is within both these principles. For the liberal construction of this action, and its extension to cases where no money has in fact been received from the plaintiff or belonging to him, see *Fenner vs. Mears,* *2 Blk. Rep.* 1269.

4. The defendant objects that there are in the contract conditions precedent on the part of the plaintiff, and that he has no cause of action until he shows a performance. The answer is, that the covenants or stipulations in this agreement, are not connected and dependent, so as to constitute conditions precedent, but are distinct and independent, giving mutual rights of action on the breaches of them. 1st. To constitute a condition precedent, it must plainly appear, from the whole instrument taken together, that the thing stipulated to be done on the part of the plaintiff, was to be done *before* that on the part of the defendant, and that the right to claim performance from the defendant was

to arise out of, and depend upon, the previous performance on the part of the plaintiff. So are all the cases in the books. *Cro. Eliz.* 888. 7 *Co.* 9, 10. *Thorpe vs. Thorpe,* 1 *Lutw.* 245. 2d. To constitute a condition precedent, the stipulation must be absolute and positive, and such as the party might perform without the necessity of any previous step by the other party. *Esp.* 131. But here the things to be done by the plaintiff are in their nature contingent, depending on acts to be done by the *defendant* himself, of which the plaintiff could have no notice, unless he received it of the defendant. The stipulations therefore, on the part of the plaintiff, cannot be conditions precedent, but the defendant's remedy on them is by a separate action, in which he must show that he has done the things on which his right is to arise, and has given the necessary notice to the plaintiff. To show that the release from *M.* and *N.* to *Hall,* enures to the benefit of all the parties, he cited *Co. Litt.* 232. *Esp.* 297.

*Mason* cited as applicable to the last objection, *Doug.* 685, 689. 4 *T. R.* 761. 8 *T. R.* 366, *and* 1 *East,* 619.

*Harper.* The case in *Comyn's Digest,* cited by the gentleman first up, has nothing to do with the case at bar. That case is where two persons make a contract—but here only one contracts. As to the *sections in Littleton*—One of them is tort by tenants in common; and the other is debt, stating that where they make a joint contract or lease both must join in the action; it could not be otherwise. All the other cases cited go to affirm the case of *Thorpe vs. Thorpe,* in 1 *Ld. Ray.* 665. The case in *Dougl.* 685, is a covenant, where "at and before the sealing and delivery of the deed, security was to be given." This is plainly a condition precedent. In the case of 4 *T. R.* 761, the payment of the money is expressly to be in consideration of the surrender. It is perfectly within the principles laid down in *Raymond.* In 8 *T. R.* 366, a number of things were to be done before August 1797.

In consideration whereof certain things were to be done by the other party. The same determination is to be found in *Cro. Eliz.* as in *Ld. Raym.* though Lord *Mansfield* said, but lately a different idea prevailed. The case in 1 *East*, 619, is, that "at and upon the execution of the conveyance," £1000 were to be paid. This is said, and most truly said, to be a condition precedent. There was a subsequent parol agreement on which the plaintiff thought he might recover. A decision in this court at May term 1803, in the case of *Morrison vs. Galloway,* (*3d bill of exception,*) is a strong case in point. There the defendant's counsel contended, that the covenant on the part of the defendant that the plaintiff should receive one half of the profits of the mill, was dependant on the covenant on the plaintiff to take up his residence at the mill, to superintend the management and direction of the mill for the joint benefit and advantage of both parties, &c. But this court decided that the covenant was an independent covenant, and that it was not incumbent on the plaintiff, to entitle himself to a recovery, to prove a compliance with or fulfillment of every stipulation in the covenant on his part to be performed.

*Martin,* (Attorney General.) for the plaintiff. In this case it appears that a valuable property was sold by the defendant, for the plaintiff, ten years ago, for what was at that time considered as specie; for it will not be denied but that *Morris* and *Nicholson* were then solvent, and their notes considered equal to specie. The defendant does not defend himself upon the merits of the case. He has pleaded the acts of limitations of three different states; and fortunately for the plaintiff, these pleas have been got rid of. The defendant now says, the plaintiff's action is misconceived, and although it be true that he has received the money, yet there is a covenant entered into for which there is no indemnity given. But he does not show the engagements so by him entered into, or that he has been called on to comply with any one of them, or that there is any likelihood he ever will be called on. Yet he

withholds the money, although he has never given no-
tice to the plaintiff of any such stipulations, or called
on him for indemnities.   And he now sets up a pri-
vate agreement, not recorded, and to which the plain-
tiff is not a party, or ever saw it till since this action
was brought, for the purpose of preventing the plain-
tiff's recovery.

The first objection is that the action is misconceiv-
ed—Whether the land was sold or not, the plaintiff
was entitled to one half as tenant in common with
Col. *Rumph*; and if it was sold, he was entitled to
one half of the purchase money.   The plaintiff is an-
swerable to *Rumph*, and the defendant is answerable
to the plaintiff. and to him alone.   If there are joint
holders of a ship, one of them cannot sell more than
his own share.   He may bring *trover* in his own name
for his share.   They are considered as tenants in com-
mon, and not as partners.   They cannot bring a
joint suit if they sell their parts of the ship; but
each must sue for his own share, even if there is a
joint sale.   So in the sale of lands, unless there is a
bond for the money or a joint contract.   This is the
reason of the case in *Espinasse* respecting the timber
sold—each had an interest in the land, and of course
in the timber.   So for the use and occupation of lands
of several persons, each are to sue for his particular
interest in the rent.   It is different from the case of
partners—there all must join, though they have
agreed among themselves as to the proportion each is
to have.   If two persons are in partnership, and one
of them entrusts an agent to sell certain of the part-
nership goods—if the agent sells, the partner who
entrusted the goods has the right of action against
the agent.   So in the case of an agent authorising
another to sell a horse, if the horse is sold, the agent
has the right of action.   It is true the principal may
forbid the payment to the agent.   Col. *Rumph* could
not join the plaintiff in this action.   The contract
was made with the plaintiff, and he alone could bring
the action.   The defendant is to pay the whole sum
to the plaintiff, unless *Rumph* forbids the payment of
his moiety.   3 *Bac. Ab.* 202, 206.

May 1805

Harper
vs.
Hampton

If two lend money, separate recoveries as to the proportion lent may be had if the case rests upon the legal operation of the transaction. But if a bond is taken, it will be different, for a payment to one would be a discharge of the debt. *Wats. Part.* 233, cited, in *Esp.* 117. The case of a stake-holder has been cited. Although the person who lost the race was not bound to pay, yet the money being deposited, the stake-holder cannot avail himself of the statute to prevent the payment over. So with respect to the case at bar, the defendant having received the money he cannot say the plaintiff has no right to recover it. The defendant had no authority from Col. *Rumph* to make sale—all the authority he had was derived from the plaintiff. The law is clear, that in a suit by one tenant in common no advantage can be taken except by a *plea in abatement.* This is placing the subject in the best point of view for the defendant, by admitting, for argument sake, that the suit should have been brought by the plaintiff and Col. *Rumph* jointly. Taking it however for granted, that the action is well brought, it remains to be considered whether there are in the agreement, conditions precedent to be performed by the plaintiff before he could call on the defendant for payment. If there is any such condition precedent in this agreement, this court has given a very erroneous decision in the case of *Morrison vs. Galloway.* In the case before the court the defendant could make no engagement or stipulation which would be binding on the plaintiff. The deed to *Hall* was delivered and received as an escrow. If *Hall* agreed to receive the deed, then the defendant was to receive the money, and pay it over to the plaintiff. The plaintiff engaged that for all guarantees, &c. which the defendant might find it necessary to enter into, counter security should be given to him. There was no engagement on the part of the defendant that he would enter into any such guarantees. The plaintiff, under the agreement, could not compel the defendant to enter into any guarantee or warranty. The engagement by the plaintiff was dependent upon a con-

MAY 1805.

Harper
vs.
Hampton.

dition precedent, that is, the defendant's entering into guarantee or warranty. To convey land, upon the purchase money being paid, is a different thing. If one of them refuses, one keeps his land, and the other keeps his money. But here the defendant gets the money, and keeps the plaintiff out of it, who loses both his land and the money, because the counter security is not given. Can it be said this is a condition precedent where the party has no redress? Surely not. The contract itself countersecures the defendant if he can depend upon the personal security of the plaintiff. A court of equity would redress the defendant after a recovery in this action, if he apprehended any danger of damnification by means of the insufficiency of the plaintiff, or in default of a counter security. Dependent covenants are where neither party's rights are materially changed. The courts never look at the possibility of the insolvency of the party. So it was in the case of *Morrison vs. Galloway.* What was the case of *Lloyd and Gray* in this court sitting on the eastern shore in April 1804? *Gray* sued for his services as overseer for the whole year, and the court said that the overseer would be deprived of recovering any thing, if it was considered a condition precedent that the overseer was to perform faithfully his duties. But that *Lloyd* had his remedy upon the covenant if the overseer had neglected any part of his duty. Authorities can be shown, that if land is sold, and the money to be paid, and it is not mentioned that the payment of the money is to depend upon the giving a conveyance, the party can sue for the money, though no deed is given. Where one covenants to pay £30, and the other to assign a house, and nothing is said that the payment and assignment are to be done at the same time, they have been adjudged to be mutual covenants. 1 *Ld. Raym.* 124. *Esp.* 282. 2 *Blk. Rep.* 1312 It has been said that the defendant might enter into *any* warranties and guarantees without limitation, and that all the papers are to be taken together, and that the agreement, or power of attorney, between the

plaintiff and *Rumph*, says *necessary* warranties, &c.
Common sense shows that only proper warranties
were to be entered into. But if it is a condition pre-
cedent, the defendant is bound to show that he gave
proper and necessary guaranties. What has the plain-
tiff agreed to do? To countersecure for all guaran-
tees and warranties—these are synonimous terms, and
apply to real or personal property. A warranty or
guarantee of real property is a covenant real, entered
into by a person selling lands, and has nothing to do
with personal covenants. The personal covenants en-
tered into by the defendant were for his own benefit
exclusively, and not for the benefit of the plaintiff.
The defendant, *Hall* and *Dennison*, make sale of a
large body of land to *M.* and *N.* or are engaged in
large speculations of lands. The plaintiff delivers a
deed for land to the defendant, executed to *Hall*, which
was not to be delivered to *Hall* unless he purchased
the land, and paid the money to the defendant for the
benefit of the plaintiff. Upon the receipt of the deed
by *Hall* it became a legal deed, and the sale complete,
and *Hall* completely indemnified by the warranty in
the deed, and if he sustained any damage, he had his
remedy upon the warranty against the plaintiff and
*Rumph*—and on any covenant made by *Hall* in a deed
given by him, a recovery could be had against him,
and then by him against the plaintiff and *Rumph*. If
*Hall* had refused to accept of the *escrow*, the defendant
might have sold the land, and then the plaintiff and
*Rumph* would be bound to indemnify him for any gua-
rantees which he might have entered into on such sale.
This is the true meaning of that part of the agree-
ment. It is only for covenants real that an indemnity
could be claimed. The inducement for the defendant's
taking the deed to *Hall*, was the large sale of lands
that he and *Hall*, with *Dennison*, were engaged in with
*M.* and *N.* and it is presumed they made a very ad-
vantageous contract, for they sold nearly a million of
acres, and the defendant is said to be worth at least
£10,000 sterling per annum, and the withholding the
money of the plaintiff, and speculating upon it, has

been in some measure, no doubt, the means of his large possessions.  By the agreement between the defendant and *Hall* with *M.* and *N.* the defendant and *Hall*, or either of them, were to execute deeds.  *Hall* had the legal estate in the plaintiff's land, and he conveyed by a proper deed.  The lines of division were to be run, and the resurveys to be made, within 8 months, of the whole of the 904.018 acres of land. The defendant had no right to make the covenant, in this agreement, to bind the plaintiff further than it respected the tract of 150,000 acres.  He had no right to connect it with the 904,018 acres.  The resurvey could not apply to the tract of 150,000 acres; for running the line would ascertain the quantity, which line was to be run by *M.* and *N.*  The expense of running the line was to be paid by the defendant and *Hall*, and the running was to be in 8 months. But admitting the 150,000 acres were to be *resurveyed*, *M.* and *N.* were first to fix on the running the divisional line within 8 months, and if they did not do it within that time, *Hall* and the defendant were exonerated from resurveying the land —and *M.* and *N.* never have, to this day, either in person or by their agents, run the line, or applied to have it run, or fixed upon the running of it.  The defendant therefore has been at no expense in running the line, and the guarantee is freed in this particular.  The expenses are not a condition precedent; for by the agreement all the expenses are to be first deducted out of the purchase money; and if any have been sustained, they can be deducted now.  A deficiency of land then, was the only thing that could possibly affect the plaintiff.  There was a pledge for the papers, and an estimate made of about what deficiency there would be in the land—not of the 150.000 acres, but of the whole 904,018 acres, and a certain sum retained as a sufficient compensation.  Here then was a complete discharge of all guarantees or warranties for any engagement entered into by the agreement between the defendant and *Hall* and *M.* and *N.*  But it is said, what could *Hall* do by which

the plaintiff could have been benefited? *Hall* stood in the place of the plaintiff, and if *M.* and *N.* ceased to have any claim against *Hall,* and the defendant, on account of the land, neither the defendant nor *Hall* could claim any thing of the plaintiff. The amount of notes retained by *M.* and *N.* were to them equal to specie—the depreciation of their notes was nothing to them. Although *M.* and *N.* may have sold the land, it is not shown that they warranted or defended it; and even suppose they did, the covenant by *Hall* and the defendant were not real covenants, and did not go with the land; they were only personal covenants, upon which a personal action alone could be brought. An assignment of the covenants could only warrant a suit in the name of the grantee of *M.* and *N.* But there being a full acquittance, no assignment could be made—on the face of the agreement it is shown that it is cancelled. The deed from *Hall* and wife to *M.* and *N.* of September 1794, contains a *general warranty;* this is a covenant real, not by the defendant, but by *Hall.* The defendant has not entered into a single guaranty or warranty on account of the plaintiff's law. We admit that *Hall* might have been called on to make up the deficiency of land if there was any; but by the acquittance this guarantee has been released, and in a court of equity, (if there was a suit on the warranty,) *M.* and *N.* might be enjoined by their discharge—a full compensation having been accepted by them in full of all deficiency, &c. We admit that if *M.* and *N.* have warranted and defended in their deed for the sale of the land, that in an action of *warrantio,* &c. *Hall* might be made answerable; and the guaranty in the deed from the plaintiff binds the plaintiff and *Rumph* to him as fully as his warranty binds him to *M.* and *N.* There is no agreement by the plaintiff to indemnify *Hall,* further than the covenant in the deed to him. The agreement between the defendant, *Hall* and *Dennison,* of the 27th November 1794, executed ten days after the sale of the land to *M.* and *N.* and the whole transaction was closed. It is not an agreement made upon the

sale of the land of the plaintiff to *Hall*—but relates to the sale to *M.* and *N.* There is in it no warranty or guaranty which is real, or which was authorised by the plaintiff to be entered into. But it is an agreement respecting 904,018 acres, one half of which the defendant was interested in, and *Hall* and *Dennison* interested in the other half. It was done to show the real interest each party had in the sale in case of death, &c. The plaintiff had no notice of this agreement, and never heard of it until since this suit was brought. It cannot possibly affect him. It relates altogether to deficiency, and as to any deficiency there has been a complete discharge given by *M.* and *N.* The defendant is bound to account for the value of the notes at the time he received them—not for what is now, or was the value at the time the action was brought. He cannot set up the pretence that the plaintiff had no right to sell the land, or that the patent was liable to be vacated. Under none of these pretences can he pocket the money he has received—It would be opening the door for every agent to cheat and defraud his employer.

*Mason*, in reply. It is contended, on the part of the defendant, that Col. *Rumph* had a joint interest in the contract, and it is of no importance whether it be called a partnership or not—that it was not in the power of the plaintiff to separate the transaction. The plaintiff's interest accrued alone on obtaining the grant. By the contract between him and *Rumph*, if the grant is obtained, the plaintiff should, in consideration of that service and his trouble, "and also of his trouble and expenses in selling the land, be entitled to one equal moiety of all vacant land, &c. and of the monies to arise from the sale," &c. The latter part of the agreement is relied on by the plaintiff's counsel; and we contend it does not bear the construction which they attempt to give to it. The land to be divided is the residue after the sale of the land, directed to be sold, and the title to that residue did not exist before the sale. *Rumph* is entitled to one

half of the amount of sales. The transaction is of such a nature that it is incapable of being severed without the consent of both *Rumph* and the plaintiff. *Rumph* retains the title to the land in himself by the power of attorney, and the plaintiff was not entitled until after the sale. We may admit that joint tenants and tenants in common may sue separately. But it does not follow that persons having a capacity to contract separately, may contract jointly, so as to make that joint which was separate, as the plaintiff and *Rumph* have done in this instance. In 1 *Com. Dig.* 12. *Esp.* 117, principles are laid down, showing that a joint contract may be made several. The only question is, Is this a joint sale and contract, or is it not? The contract between *Rumph* and the plaintiff, the power of attorney, and the contemplated agreement between *Rumph* and the plaintiff, on the sale which was made of *Rumph's* part, are all to be taken together so as to form one contract, with the contract which has been erroneously called a contract between the plaintiff and defendant, but which in fact is an agreement between *Rumph*, the plaintiff, and the defendant. The contract is signed by the plaintiff for himself and *Rumph*, and he is stated throughout to be the attorney of *Rumph*. The deed to *Hall* is *Rumph's* deed. If the plaintiff has in the contract with the defendant introduced his own name, when by the power of attorney he was not warranted, his name will be rejected. It will be considered as the contract of *Rumph*, or as the contract of *Rumph* and the plaintiff, and cannot be considered the contract of the plaintiff alone. In the case of a factor's selling, he does so to persons not knowing he acts as factor. He is relied upon on his own credit. But in the case of an agent, as the present case, it is stated that he is acting for *Rumph*. The court will so construe the contract as to make every part of it relate to the plaintiff as attorney for *Rumph*, or for himself and *Rumph*. It has been said, that advantage of this objection should have been taken by plea in *abatement*. Where a defendant is sued alone, who is a partner

with another, then the plea in abatement is to be put in—but in the case of the plaintiff being a partner, or joined with another, &c. it is different. The plaintiff must make out his case correctly, or he cannot recover. But *are the conditions in* this case, *conditions precedent?* The positions of the attorney-general seem to have branched themselves into five objections: 1. That the defendant had no right to enter into any warranty, &c. 2. That if he did they were such as were not binding on the plaintiff. 3. That the release executed by *M.* and *N.* to *Hall*, removed all liabilities, &c. 4. That the agreement between the defendant, *Hall* and *Dennison*, is not obligatory on the plaintiff; and 5. That the agreement does not contain a condition precedent.

1. It has been said that covenants real were alone to be given—such as follow and go with the land: There were real covenants contained in the *escrow*, and it is evident that the other covenants mentioned were intended to be personal, or why were any other mentioned? If it was not necessary for the defendant to give a deed, how could he make a covenant real? It is clear then, that personal covenants alone were contemplated by the contract between the plaintiff, and defendant. Warranty and guaranty may be and are applied to warranting a horse to be sound. The defendant had no title in the land, and he could give only personal covenants. *Hall* was a mere instrument between the parties. If it is true, as contended, that on the 10th of September 1794, the sale was made, there is no evidence of the payment of the money or notes by *Hall* to the defendant. It has nothing to do with the sale to *M.* and *N.* The *escrow* was not to be delivered to *Hall* unless the money was paid or properly secured. And none of the counts in the declaration will cover the case in the point of view that the defendant delivered the deed, but did not receive the money, or have it properly secured. This however is not the proper point of view in which this subject ought to be placed. The plaintiff knew of the sale to *M.* and *N.* and did

not object to it—but by his acquiescence has approved of it.

2. If the grant is declared void, is not the deed to *Hall* void also? The defendant's covenant will be in force against him. The counsel for the plaintiff have not properly explained the contract with *M.* and *N.* as to the running the lines of division and resurveying the lands. By the stipulations in that agreement, the resurvey was to be made before the running of the line of division. How could the line be run before the resurvey was made? The line was to be run by the defendant and *Hall*, for it is stated that *M.* and *N.* were to direct how it was to be run, and that could not be done before it was ascertained what vacant land there was in the tract. The reason why the defendant and *Hall* did not comply with the stipulations as to the 150,000 acres was, the defendant had acted for the plaintiff without fee or reward, and he gave notice to the plaintiff, who was bound to perform. It was not that there were 150,000 or 1000 acres, or that the grant would not be set aside. Hence the necessity for counter security to guard against events which might happen. The stipulations were necessary in the sale of the lands to *M.* and *N.* for unless they had been made, *M.* and *N.* would not have purchased, and if they had not, *Hall* would not have purchased the plaintiff's land. The plaintiff's liability can be separated in all the stipulations made in the great sale to *M.* and *N.* It is true that if 904,018 acres were made up to *M.* and *N.* the contract with them would be complete; if however the plaintiff's land had fallen short, or had been taken away, he could have no demand on the defendant.

3. The release goes only to the deficiency of *papers* not delivered, and not for deficiency of *land.* The notes had been retained to secure the production of title papers, and not on account of any supposed deficiency in the quantity of land. Some of the papers were delivered six years after, and not within the eight months. But suppose the release relates to the deficiencies of land—it will not discharge after breach-

es of the covenant. Suppose after the release the

court were to annul the grant, the release would not operate. Suppose all are released, the plaintiff cannot take advantage of it. If *M.* and *N.* agreed to take the amount of notes for deficiency of land, it had nothing to do with the plaintiff. It was a bargain between *M.* and *N.* and *Hall* and the defendant. It was not binding on him, and he cannot be benefitted by it. If he consented to take it, he should have given notice. But there is nothing to show the plaintiff assented to the agreement previous to his attempt to claim a benefit under it. If it gave the plaintiff a cause of action, when did it accrue so as to entitle him to demand the value of the notes? The release is in 1800. If the notes had not sunk, and *M.* and *N.* had remained in credit, and the defendant had sold their notes at a price less than the value, the plaintiff would not have been bound by such sale. As therefore he would not be bound by a loss, shall he be permitted to derive any benefit from a gain?

4. The plaintiff, unless he admits the agreement made between the defendant, *Hall* and *Dennison*, has no cause of action. For all the transactions in the sale are between the defendant and *Hall.* If *Hall* required a guaranty for the plaintiff's land, the defendant was bound to give it. And it seems that he did require it, and that it was given. Contracts in *pari materia* are to be taken and construed together, and this contract must be taken in connection with those between *Rumph* and the plaintiff, and the plaintiff and defendant. It is a contract for the benefit of *Rumph* and the plaintiff, as the sale could not have been effected without the stipulations contained in this agreement, and they are necessary and proper stipulations. But it has been said this agreement was not known to the plaintiff until since this action was brought. It existed in fact, and the plaintiff knew of it in March 1802, and when he had a knowledge of it, he well knew it affected his cause of action. The plaintiff ought to have demanded his money of the defendant, tendering an indemnification. But there is no evidence

of such demand and tender, or that the defendant refused to say to what extent he had engaged, and for which he required indemnity—or that he refused any counter security offered, and refused to deliver the notes to the plaintiff. But the plaintiff must have had notice of this agreement, for it is not likely the defendant would have mentioned the sale of the land, without stating the indemnities, &c. The plaintiff is concluded from saying he had no notice of the agreement. He and the defendant were together after the agreement, for the defendant witnessed the subsequent agreement between *Rumph* and the plaintiff for the purchasing of *Rumph's* share.

5. If two parties contract, and there is no stipulation giving a credit, the court will consider it a dependent covenant. If the counter security is not to be given before the paying the money, the agreement is perfect nonsense. If the security was to be given after the payment of the money, what security but the agreement alone is to be relied on until the security is given? There is an express stipulation that the defendant is not to rest alone upon the agreement, but upon counter security. In *Preston vs. Kingston, Dougl.* 690, Lord *Mansfield* said, "that the dependence or independence of covenants was to be collected from the evident sense and meaning of the parties, and that, however transposed they might be in the deed, their dependency must depend on the order of time in which the intent of the transaction requires their performance." Apply that case to the case now before the court. It is immaterial how the expressions are—the evident meaning of the parties is to govern. If the money is paid without the security there would be a time when a correlative risk would be run. If the plaintiff could and would not, or if he could not give the security, it is not the fault of the defendant, but his own fault. In 8 *T. R.* 370, Mr. Justice *Le Blanc* said "that no person shall call upon another to perform his part of a contract, until he has himself performed all that he has stipulated to do as the consideration of the others promise; and this, whether the one

be stated in terms to be in consideration of the other or not. The same doctrine is recognized by Lord *Kenyon,* in 1 *East,* 629.

MAY 1805

Harper
vs
Hampton.

CHASE, Ch. J. *(a).* In forming an opinion on the questions which have arisen in this case, and which have been so amply and ably discussed, the court have taken into view principally the agreement of the 22d of August 1794, between the plaintiff and Col. *Rumph;* the power of attorney from *Rumph* to the plaintiff of the same date; the agreement of the 25th of August 1794, between the defendant and the plaintiff, for himself and Col. *Rumph,* and the contract of the 15th of November 1794, between *Wade Hampton, John Hall,* and *Morris* and *Nicholson;* the admission of facts in the case, and the acknowledgment of *Morris* and *Nicholson* to *John Hall,* dated the 27th of May 1800.

The court consider the testimony which has been adduced as applicable to the *ninth count* for money had and received, and are of opinion that it was not necessary to join Col. *Rumph* in this action.

The plaintiff, in virtue of the first agreement between him and Col. *Rumph,* acquired an equitable interest in a moiety of the land, and by the power from Col. *Rumph* to sell and convey the whole land, &c. had a right to receive the whole sum from the defendant, under his agreement with the plaintiff, dated the 25th of August 1794, the one half in his own right, the other half as attorney for Col. *Rumph,* to whom he is accountable—the power to sell and convey involving in it the right to receive the money, which the defendant cannot controvert in derogation of his own agreement. The land was sold to *Morris* and *Nicholson,* through the agency and intervention of *Hall;* and the defendant, by entering into the contract with *Morris* and *Nicholson,* became responsible to the plaintiff for what he received on account of the 150,000 acres of land.

(a) The chief judge observed that Mr. *Done,* not hearing all the arguments of counsel, did not give any opinion, but that Mr. *Sprigg* and himself concurred upon all the points submitted by the counsel.

May 1805
Harper
vs
Hampton

What stipulati-
on in a covenant is
a condition prece-
dent. See *Post pl.*
*5, 6—*The *third*
and *fourth bills of*
*exceptions*

The court are of opinion, that the defendant and *Hall* did enter into engagements with *Morris* and *Nicholson* respecting the 150,000 acres of land, and that he, with *Hall*, was bound to have the whole 904,018 acres of land resurveyed, and that it was necessary to have the 150,000 acres resurveyed for the purpose of excluding elder surveys, and ascertaining the vacant land, before the line of division could be run; and that the liability of the defendant to account for deficiency did not cease before the 27th of May 1800, when *Morris* and *Nicholson* accepted the \$27.647 in notes, as an equivalent for the deficiency of the said lands sold them.

It now remains for the court to express their opinion on the agreement between the plaintiff and defendant.

The manner of
expounding con-
tracts. Extrane-
ous matter, ex-
planatory thereof,
may be resorted
to

In expounding contracts the court has adopted the principle recognized and established by the courts in England—That the sense and meaning of the parties, to be collected from the contract and the nature of the transaction, is to be regarded; and that it does not depend on any technical words or precise form, whether a covenant is mutual and independent, concurrent, or in the nature of a condition precedent. This principle is founded in justice, is agreeable to common sense, and does not infringe any rule of decision.

In deciding the cases which have recently occurred, *(Morrison* and *Galloway,* and *Lloyd* and *Gray,)* the court had this principle in view, and intended to be governed by it. In both those cases there were a variety of covenants stipulated to be performed, some by the plaintiff, and some by the defendant. In the case of *Morrison vs. Galloway,* if the court had decided the covenants on the part of the plaintiff to be in nature of a condition precedent, he would have been deprived of the benefit of his contract by the nonfulfilment of a stipulation of trivial importance, and the court thought the defendant could be compensated in damages; and so in the case of *Gray vs. Lloyd,* the overseer would have lost his year's wages by not performing some stipulation on his part from

whence little damage would have accrued to the defendant.

MAY 1805.

Harper
vs.
Hampton

If the agreement is to be considered, without resorting to any extraneous matter explanatory of it, then the plaintiff cannot recover, without proving that the defendant did receive money from *Hall*, to whom the deed was delivered; but in the opinion of the court it must be considered with the agreement between the defendant and *Hall* with *Morris* and *Nicholson*.

It was certainly contemplated by the plaintiff and defendant that the defendant should or might be obliged, in order to sell the land, to enter into warranties or guaranties, and that it was reasonable if he did that he should be countersecured or indemnified.

Warranty cannot be taken in the confined sense contended for; because being a covenant real the defendant could not enter into it, as the legal estate would vest in *Hall* on the delivery of the deed to him. It must be taken in a more comprehensive sense, and to signify any engagement by which a liability was created on the part of the defendant.

*The term war-ranty is not to be taken in a confined sense*

It is the opinion of the court, that it was the sense and meaning of the parties that the giving the counter security was to precede or take place at the time of paying the notes of *Morris* and *Nicholson* to the plaintiff; and that he cannot support this action unless he can prove that he did give or tender such security; or unless he can prove that the defendant did convert the said notes of *Morris* and *Nicholson* to his own use; and in such case, it is the opinion of the court, that the defendant is accountable for the value at the time of such conversion. The defendant excepted.

*Held—That counter security, (to be given by a principal to his agent,) was to precede the payment of notes received by the agent, and that the principal could not recover unless such security was given, or unless proved that the agent converted the notes to his own use; and in that case he was accountable for the value at the time of the conversion*

3. *Mason*, for the defendant, suggested to the court, before the signing of the preceding bill of exceptions, that the *release* from *M.* and *N.* was not *under seal*, and he doubted therefore how far it would operate.

*To dissolve a covenant, something of equal solemnity must be shown. If the breach has accrued, accord and satisfaction is a good plea, but not otherwise*

CHASE, Ch. J. That question was not made by the counsel in arguing the case, nor did it occur to the

*How far a release, not under seal, will amount to a satisfaction or discharge of the breach of a covenant contained in a contract under seal*

court. The court are not satisfied, and wish to hear an argument upon the subject. The court also wish to know what effect the release would have in an action of covenant by *M.* and *N.* against *Hall* and *Hampton,* for deficiency or nonperformance, &c.

*Harper.* Where an action arises immediately on the covenant, or other deed, under seal, accord and satisfaction, without deed, under seal, is no plea. But if it arises mediately, and is for damages on account of something not done which the defendant had covenanted to do, accord and satisfaction without deed, is a good plea.—6 *Coke.* 44. *Bac. Abr.* tit. *Accord and Satisfaction, Cro. Jac.* 254. 2 *Wils.* 86, 376.

*Mason,* contra. The release must be under seal, and must have the same formalities as the original covenant. This court, in the case of *Somerville vs. Hebb,* at May 1803, decided. that an agreement not under seal, endorsed on the bond, should not be received to prove that the defendant had under that agreement tendered tobacco in satisfaction of the debt. But if the release in this case operated as to the then existing breaches, it could not operate to affect any subsequent breaches. *Esp.* 307, 308. 1 *East,* 619. This is not a release of *all covenants,*—it is only a release of breaches actually sustained at the time, and cannot operate as a release of subsequent breaches which might accrue. The resurveys have not been made, and it is not certain that the covenants to resurvey the lands were broken or not—and if not broken, the release does not release them. But if the lands are hereafter resurveyed, and a deficiency is ascertained six months after the breaches accrue, accord and satisfaction does not take it in— the release could not affect or release the deficiency thereafter to accrue. It amounts to an agreement between parties to substitute one thing for another. This cannot be done except by deed under seal. *Rogers vs. Payne,* 2. *Wils.* 376.

*Martin*, (Attorney General,) in reply. The great object of the parties to the contract was to know if there was any deficiency in the land sold, and if so to receive compensation for it. It was uncertain whether there was or was not any deficiency. And the parties finally chose to wave it by the release executed. If there is the quantity of land, there is no possibility of supporting an action on the covenant, and if there was a deficiency, it accrued long before the release in 1800. The deficiency, if any, existed without a resurvey, and if there was any it is embraced by the release. The case in *Esp.* 308, has no analogy to the present. That case was for the payment of rent which had not become due. The contract in this case was either broken when the release was given, or it was impossible to be broken—for it was to be done in 14 months. All possible right of action accrued before the release in 1800.

CHASE, Ch. J. It seems to be agreed, that to dissolve a covenant, something of equal solemnity must be shown. If the breach has accrued, accord and satisfaction is a good plea—But not for breaches not yet taken place.

Three things were to be performed by *Hall* and the defendant.—The title papers were to be produced—the resurvey was to be made, and the deficiency of land, if any, was to be made up. One of these covenants has been complied with, the other two have not. The paper releasing from all deficiency, and acknowledging satisfaction for any deficiency, is evidence to the jury that there was a deficiency, and the party agreed to accept the money in full discharge for all such deficiency.

Had *Morris* and *Nicholson* brought their action of covenant, they could have recovered damages for the deficiency, and in order to recover damages, deficiency must be shown; and had they filed a bill in chancery for a specific performance, a court of equity would say, having received full compensation the bill must be dismissed.

If the jury find there was a deficiency, and that *Morris* and *Nicholson* have accepted a compensation, this paper will be sufficient to discharge the parties.

The court consider their former opinion given as the proper opinion in the case.

*Where the onus probandi lies on a principal to prove the conversion of notes received for him by his agent, the jury will not be directed to presume the agent had disposed of them, &c But such notes are to remain in his hands as a deposit until an engagement to him by his principal ceases, unless counter security was given &c*

4. *The second bill of exceptions.* The plaintiff then prayed the opinion of the court, and their direction to the jury, that inasmuch as it has been proved that the defendant in this action received into his possession, in November 1794, the notes of *Morris* and *Nicholson*, for which this action is brought, the jury may and ought to presume that he disposed of them for his own benefit for their full value, at the time of such receipt, unless he can now show when and in what manner he disposed of them.

*Harper.* Under the opinion which the court has given, the issue lies affirmatively upon the plaintiff to prove that the defendant converted the notes to his own benefit. The plaintiff has proved that the defendant received the notes, and it is incumbent on the defendant now to show what he has done with them; for a man who has it in his power to tell the truth, but refuses to do so, is to take all the consequences. The defendant has had full notice to produce the notes, if they were in his possession or power, or to say what has become of them. He has been particularly careful of all the plaintiff's letters to him which he conceived would operate in his favour, and it is to be presumed he would not be less careful of the notes, which were at least as valuable to him as many of the letters he has produced. When this case was before the court this time twelve months, the defendant was then present, and he was called upon very forcibly to produce the notes, and he well knew that a production of the notes was all that he need do; but he then neglected, and does still neglect to produce them, or to say what has become of them. It is easy for him to show —but it is very difficult for the plaintiff to do so. They may be locked up in the defendant's desk, or they may

have been used by him very beneficially to himself. In *trover*, demand and refusal is evidence of a conversion—and it is so, because the defendant could, if he had the thing sued for, produce it, and thereby excuse himself—but if he refuses, it is evidence that he has converted it to his own benefit. So in the present case, the notes not being produced, it is to be presumed the defendant has used them to his own advantage. The case of the jewel reported in *Salkeld*, and cited in *Buller* 43, is a very strong one in point. Nothing more is necessary than to trace the property to the possession of another; and being so traced, he is bound to produce it, or account for it according to its value at the time when it came to his hands. No principle of law is better established.

*Mason.* contra. The plaintiff's right to call on the defendant for the notes, first accrued in 1800, and if so the notes were of no value then, as is proved by testimony in the cause, and by the plaintiff's admission in his letter to the defendant of the 9th of August 1797, in which he says, "the resource of *Morris* and *Nicholson's* notes has entirely failed." *Bond's* deposition shows also that the notes were of no value in August 1797.

*Johnson.* on the same side. The notes were payable at different times, and long before the day of payment of a number of them, they ceased to be of any value. Suppose an agent had sold goods, and he had lost the evidence of the debt, would it be presumed that he had received payment? The inference is the reverse in this case, for as the notes were of no value when the plaintiff's right accrued, it is to be presumed they were not disposed of at all by the defendant. There have been no letters produced which were written by the defendant to the plaintiff, and the court might say the jury ought to presume that the defendant had in those letters accounted for the notes. If the defendant has parted with the notes for value, or in any other way, how easy would it be for

him to purchase them up for little or nothing, for it is admitted a waggon load of them is not worth a quire of paper.

*Key*, in reply. It is in furtherance of justice to compel the defendant to account for or produce the notes, and on his neglect, that a conversion should be presumed. If an agent receives tobacco worth ten dollars per hundred, and he is to give the notes up when security is given to him—if, when the security is given, the tobacco is worth only five dollars per hundred, and the agent refuses to deliver the notes, but claims to pay for the tobacco at the rate of five dollars per hundred, it will be presumed that he converted the tobacco to his own use when it was worth ten dollars. The defendant in this case, to discharge himself, must show he had the notes in 1800, or produce them.

*Martin*, (Attorney General,) also in reply. The counsel for the defendant has taken it for granted, that as the plaintiff had agreed to countersecure the defendant, that such guaranties had been entered into by him which rendered a counter security necessary. There was no authority given to the defendant to sell for *M.* and *N's.* notes. The notes were an article of circulating merchandize, and the defendant should have disposed of it as quick as possible. He was not bound to keep the notes. It is not to be presumed that the defendant would let the notes die in his hands when he was bound in a covenant under which he might be answerable for £7500—especially as he was himself a great speculator in lands, and these notes were in the market, and receivable in the exchange and purchase of lands, &c. Suppose he rebought the notes; he might be detected in many ways. The endorsements might show he had disposed of them to their value. These notes were better than government certificates at one time, and long after the sales by the defendant.

CHASE, Ch. J. *(a)*. The court cannot give the direction prayed for by the plaintiff.

*(a) Done* and *Sprigg* J. concurred.

The court are of opinion that the notes of *Morris* and *Nicholson* were to remain in the hands of the defendant as a deposit, until the engagement of the defendant under the contract of the 15th of November 1794 ceased, unless the plaintiff and Col. *Rumph*, in the intermediate time between the 15th of November 1794 and the 27th of May 1800, had given, or offered to give, counter security to the defendant to indemnify him against his liability under his engagement to *Morris* and *Nicholson*. The plaintiff excepted.

5. *The third bill of exceptions.* The plaintiff then prayed the opinion of the court, and their direction to the jury, that the stipulation on the part of the plaintiff for himself and *Rumph*, contained in the agreement of August the 25th, 1794, is not a condition precedent to the stipulations on the part of the defendant in such agreement contained; but that the stipulations on the part of the defendant, and of the plaintiff for himself and *Rumph*, are to be taken as mutual and independent covenants.

*Harper.* To constitute a condition precedent, it must appear that the thing to be done on one side, was the consideration of the thing to be done on the other. This makes the covenants dependent. But if the two things depend, each of them, on a distinct consideration of its own, then the covenants are mutual and independent. This principle will be found to govern all the cases. *Nichols vs. Raymbred*, *Hob.* 88. (This case is cited and admitted in 1 *Lord Raym.* 665.) 1 *Roll. Ab.* 414, 415. *Lea vs. Excelby*, *Cro. Eliz.* 888. *Smith vs. Shelden*, 2 *Mod.* 33. *French vs. Trewin*, 1 *Ld. Raym.* 124. *Thorpe vs. Thorpe*, 1 *Ld. Raym.* 665. (This case cited and admitted in 6 *T. R.* 572.) *Blackwell vs. Nash*, 1 *Stra.* 535. The later cases have overruled the more ancient, so far as they required this mutuality of consideration. But there is no case, ancient or modern, in which one stipulation was declared to be a condition precedent to another, unless the performance of the first clearly appeared, on the whole

MAY 1805

Harper
vs
Hampton

A stipulation in a contract on the part of a principal, that for all warranties or guaranty his agent should enter into about the sale of the principal's land, he would give him a sufficient indemnity—Held, to be a condition precedent to stipulations on the part of the agent, that a deed of the lands was to be delivered by him to J H upon his paying the purchase money, which was to be received by the agent for his principal, & accounted for to him.

That the agent was not bound to pay over to his principal certain notes received for contract, until the agent was indemnified against his liability under an engagement entered into about the sale of the lands.

view of the transaction, to be the consideration for the performance of the second. This is the great principle of the later decisions, as well as of the old ones. The difference between them lies in the application of the principle. 1 *Roll. Ab.* 415, *pl.* 10. *Peters vs. Opie.* 1 *Vent.* 177. *Lancashire vs. Killingworth,* 1 *Ld. Raym.* 686. *Collins vs. Gibbs,* 2 *Burr.* 899. *Kingston vs. Preston.* 2 *Doug.* 689. *Jones vs. Barkley.* 2 *Doug.* 684. *Goolison vs. Nunn.* 4 *T. R.* 761. *Glazebrook vs. Woodrow,* 8 *T. R.* 366. *Heard vs. Wadham,* 1 *East,* 619. But in the case before the court, the giving the indemnity was not the consideration, nor any part of the consideration for the delivery of the notes. The consideration for their delivery was the previous receipt of them by the defendant from the sale of the plaintiff's property. The consideration for giving the indemnity on the other hand, was not the delivery of the notes, but the entering into the guaranty. To make one stipulation a condition precedent to another, it must not only be the consideration of that other, but *the whole consideration.* If it be the consideration in part only, it is not a condition precedent, but an independent covenant. And the reason is plain; for in the latter case the injury resulting from the nonperformance of one may, and probably will, be much greater, than that resulting from the violation of the other. But in the former case, where one is the whole consideration of the other, the injury from the breach of either must be equal. *Cole vs. Shallett,* 4 *Lev.* 41. *Boone vs. Eyre,* 1 *H. Blk.* 273,(*n*). *Duke of St. Albans vs. Shore.* 1 *H. Blk.* 270, 278. *Campbell vs. Jones,* 6 *T. R.* 570. *Morrison vs. Galloway,* (*3d bill of exception.*) in this court. There are two exceptions perhaps to this rule.—1st. Where there is a positive stipulation that one thing shall be done before the other. *Kingston vs. Preston.* 2 *Doug.* 689.—And 2d. Where one thing is far the most material part of the consideration of the other. *Glazebrook vs. Woodrow,* 8 *T. R.* 366. But the case before the court comes within neither exception. If we take the doctrine of *intention*

on the broadest ground, still this cannot be a condition precedent. For it is impossible to believe that the plaintiff meant to enable the defendant to retain this large property on account of any trivial stipulation in the nature of guaranty, to which neither of them might attach any importance. If we take it on the ground of *justice to the parties*, the defendant will have no better success. For considering these as independent covenants, the most complete justice may be done to the defendant in various ways. 1. By retaining an adequate part. 2. By bill in chancery if he was in danger of being damnified. 3. By damages, if actually damnified. But by taking it as a condition precedent, the most, glaring injustice is done to the plaintiff in this very case. It is of the essence of a condition precedent that the right vests only on its performance. This appears from every case, and from the nature of the thing. But it is impossible to imagine here, that the plaintiff's right to receive the price of his land did not vest when that price came into the hands of his agent. A condition precedent must be of such a nature that he on whom it lies may perform it without waiting for a previous act of the other party. Here a previous act of the other party, viz. notice of the guaranty, was necessary before the plaintiff could give the indemnity. The right certainly vested till notice, and matter *ex post facto*, which is to divest a right, cannot be a condition precedent. *Hotham vs. The East India Company*, 1 *T. R.* 645.

CHASE, Ch. J. The court are of opinion, that the stipulation on the part of the plaintiff and *Jacob Rumph*, is a condition precedent; and that the defendant was not compellable to deliver or pay over to the plaintiff the notes of *Morris* and *Nicholson* so received by him, until the plaintiff gave, or offered to give him counter security, to indemnify him against his liability under his engagement to *Morris* and *Nicholson*. The plaintiff excepted.

MAY 1805

Harper
vs
Hampton

MAY 1805

Harper
vs
Hampton

Where an agent had by contract agreed to sell and convey several tracts of land to *M* and *N* including therein the land of his principal, in which contract it was stated that the lines of division of two tracts, (a part of each of which was to be conveyed,) one of them belonging to the principal, out of which a part only was sold, had not been run, that the lines of division should be run under the direction of *M* and *N* so that they should have their full quantity of land out of each of those tracts, clear of elder survey; and that within eight months after the contract, actual resurveys should be made of the whole of the lands sold—*Held,* that the agent was bound to have the whole of the lands resurveyed, also the particular part sold for his principal, so as to exclude elder surveys, and that it was necessary to make the resurveys before the lines of division could be run.

6. *The fourth bill of exceptions.* The plaintiff further prayed the opinion of the court, &c. that in consequence of the agreement entered into between *Morris* and *Nicholson,* and *Hall* and *Hampton,* dated the 15th of November 1794, the lines of division by which *M.* and *N.* should elect to have the 150,000 acres of land run, to be divided from the residue of the survey of which they were to be a part, were necessary to be run by *M.* and *N.* or their agent, or under their direction, before the 150,000 acres were to be resurveyed by *Hall* and *Hampton;* and that as the resurvey of the whole 904,018 acres were to be made within eight months after the date of the contract, unless *M.* and *N.* or their agent, did direct how the lines of division should be run, within eight months after the date of the agreement, the engagement that the 904,018 acres should be resurveyed, as far as relates to the 150,000 acres, was dispensed with by *M.* and *N.* and their right to recover damages against *Hall* and *Hampton* for not resurveying the 150,000 acres under the contract, was by them, *M.* and *N.* lost and ceased.

*Harper.* Under the contract of the 15th November 1794, *M.* and *N.* had no claim against *Hampton* and *Hall* for not resurveying the land, unless they, within eight months, directed how the division line should be run. Making the resurveys was to be the joint act of the parties, and at their joint expense; therefore *Hampton* and *Hall* were not bound to do it without the co-operation of *M.* and *N.* And if that co-operation was not offered till the time had elapsed, *Hampton* and *Hall* were absolved from their engagement. The line of division had nothing to do with the resurvey. The object of it was to designate in what part of the tract they would take their 150,000 acres; and they were to direct the running so as to secure that quantity. It was their business to qualify themselves for giving this direction by gaining accurate information about the land. The resurvey was not to be of the whole tract, but of the 150,000 acres after the division line should be run. If there should then appear to be a

deficiency, not in this parcel, but in the whole quanti-ty sold, *Hampton* and *Hall* were to make it up. This construction is supported—1. By the nature of the whole transaction. 2. By the order in which the co-venants stand. The running of the line therefore was necessarily antecedent to the resurvey, and depending on an act of *M.* and *N.* which they never did, they had no right to claim damages because such resurvey was not made.

MAY 1805

Harper
vs
Hampton

CHASE, Ch. J. The Court are of opinion, that the defendant and *Hall* were bound by the contract of the 15th of November 1794, to have the whole 904,018 acres resurveyed; and that it was necessary to have the 150,000 acres resurveyed for the purpose of ex-cluding elder surveys, and ascertaining the vacant land; and that it was necessary to make the resurveys before the line of division could be run under the di-rection of *Morris* and *Nicholson.* The plaintiff ex-cepted.

7. *The fifth bill of exceptions.* The plaintiff further prayed the opinion of the court, &c. that in conse-quence of the covenants entered into by *Hall* and *Hampton,* with *Morris* and *Nicholson,* by the contract dated the 15th of November 1794, the defendant had no right to withhold from the plaintiff the notes received for the sale of the 150,000 acres of land, any longer than eight months after the date of that contract, unless they made a resurvey by the expira-tion of that time of the 150,000 acres, or unless on such resurvey a deficiency was found in the 150,000 acres of land sold on the account of the plaintiff and *Rumph.*

*That under the above contract with M. and N. the agent had a right to withhold from his principal the notes received for the sale of his land, although the resurvey of that land had not been made within eight months.*

CHASE, Ch. J. The court are of opinion, that the defendant had a right to withhold the notes until the 27th of May 1800, the said engagement being an ex-isting engagement until that time, although the resur-vey above referred to was not made within eight months from the date of the contract. The plaintiff excepted.

MAY 1805

Harper
vs
Hampton

*That it was incumbent on the agent to give notice to his principal of the above contract within the eight months, that he might cause a resurvey to be made of his land within the time limited; and in order that the principal might counter secure his liability under that contract*

*The notice, and the time of giving it, are facts to be decided by the jury.*

8. The plaintiff further prayed the opinion of the court, &c. That under the contract of *Hall* and *Hampton*, with *Morris* and *Nicholson*, of the 15th of November 1794, it was incumbent on, and the duty of *Hall* and *Hampton*, in virtue of the covenants entered into, to make the resurvey of the 904,018 acres of land, within eight months from the date of said contract; and that it was not incumbent on the plaintiff and *Rumph*, or either of them, to cause the 150,000 acres of their land, included in the sale to and contract with *M.* and *N.* to be resurveyed, unless notice was given to the plaintiff or *Rumph*, or either of them, of the said contract, in time to be able to resurvey the same; and that if Hall and the defendant failed to give such notice to resurvey the same within eight months as stipulated, and failed to make the resurvey of the 150,000 acres within the time stipulated, that then they could not, after the expiration of that time, withhold from the plaintiff his proportion of the money or notes received for the 150,000 acres of land.

CHASE, Ch. J. The court are of opinion, that it was incumbent on the defendant to give notice to *Rumph* and the plaintiff, or one of them, of the contract of the 15th of November 1794, within eight months from the date of that contract, and at such time within the eight months that *Rumph* and the plaintiff might have caused a resurvey to have been made of the 150,000 acres of land, within the time limited for making the same by the contract, and in order that the counter security might have been given by *Rumph* and the plaintiff, to indemnify the defendant against his liability to *Morris* and *Nicholson*, under the contract.

The court are also of opinion, that the notice, and the time of giving the same, are facts to be decided by the jury upon the evidence in the case.

9. The defendant then prayed the opinion of the court, and their direction to the jury, that by the contract of the 25th of August 1794, the notes of *Morris* and *Nicholson*, received by the defendant for the sale of the lands in the declaration mentioned, were to remain in the hands of the defendant as a deposit until the engagements of the defendant, under the contract of the 15th of November 1794, ceased, unless the plaintiff and Col. *Rumph* in the intermediate time between the 15th of November 1794, and the 27th of May 1800, had given or offered to give counter security to the defendant, to indemnify him against his liabilities under his engagement to *M.* and *N.* on the 15th of November 1794. That during the time from the 15th of November 1794, until the 27th of May 1800, it was the duty of the defendant to have held these notes for the plaintiff, and if, having so kept the notes, they became of no value, it would be the loss of the plaintiff. That if at any time between the 15th of November 1794, and the 27th of May 1800, the defendant had sold the notes for less than their nominal value, or had appropriated the same to his own use, and the notes had at this time risen in value, so as to be worth what they expressed upon the face of them, with interest thereon, the plaintiff would have a right to recover of the defendant the present value of the notes; but that if the notes at this time, and at the time of bringing this action, are and were of no value, that then the plaintiff might elect to affirm any sale of them before made by the defendant, if such sale had been made, and under the count in the declaration for money had and received, recover from the defendant the price for which he had actually sold the notes, or the value of the notes when the defendant converted them to his own use, if he did so covert them: But that, in the event of the plaintiff's making such election, it was incumbent upon him to prove to the jury an actual sale of the notes by the defendant, or an actual conversion of them to his own use, and the price for which the same sold, if they were sold, or

*MAY 1805.*

Harper
vs
Hampton

*Where notes received by an agent for his principal, and remaining in the hands of the agent as a deposit, became of no value, it is the loss of the principal.*

*If the agent had sold the notes for less than their nominal value, and they had now risen in value, the principal could recover the present value.*

*But if the notes are now of no value, then the principal might elect to affirm any sale made by his agent, and recover the price for which they were sold.*

*In the event of the principal so electing, it is incumbent on him to prove an actual sale of the notes, and the price, &c.*

the actual value of them when they were sold by the defendant, or converted to his own use.

CHASE, Ch. J. The court give the direction to the jury as prayed by the defendant.

A juror was again withdrawn by consent of the parties, and the cause continued until this term, when it again came on for trial.

*A party has a right to a continuance of the action where testimony obtained under a commission, returned at the present term, is about to be used by the opposite party*

10. Leave by consent of the parties had been given at the last term to the plaintiff and defendant to take out commissions to sundry places for the purpose of getting testimony, with a proviso that if the commissions were not returned at the present term, it should be no cause for the continuance of the case until the next term. The plaintiff's commissions were returned with testimony; and the question was, whether the defendant was entitled to a continuance?

CHASE, Ch. J. The defendant has a right to a continuance where the plaintiff is about to use testimony obtained under a commission returned at the present term. See *Norwood vs. Owings*, (*Ante* 296.)

The plaintiff withdrew his commissions, and the jury were sworn.

*Harper.* The opinions given by the court in this case at the trial at the last term, have reduced the case to a narrow compass, and the only questions for the jury to decide are—

1. If the defendant did not give the plaintiff and *Rumph*, or one of them, notice within eight months to make the resurveys, &c. then the jury are to find the whole amount of the notes of *M.* and *N.* at the time the defendant received them; but

2. If the jury find that the notice was given, then, if the defendant has appropriated the notes, or any of them, the jury are to find for the plaintiff the value of the notes at the time of such appropriation.

11. *The sixth bill of exceptions.* The plaintiff, in addition to the statement contained in the several bills of exceptions herein before set forth *(a)*, offered evidence to the jury to prove, that the deed from him to *John Hall*, of the 10th of September 1794, and delivered to the defendant as an *escrow*, was by the defendant delivered to *Hall*, who accepted the same, and that the lands contained in that deed were by the defendant sold to *Morris* and *Nicholson*, and were afterwards, on the 17th of November 1794, by deed conveyed, in pursuance of the sale, to *M.* and *N.* by the deed of the 17th of November 1794, before set forth. That the deed so made by *Hall*, was accepted by *M.* and *N.* as a good and valid assurance and conveyance of the lands. And further, that since that period *M.* and *N.* have conveyed these lands to third persons; and that it does not appear from the evidence in the case that any person claiming under or through the deed of the 10th of September 1794, has ever at any time objected to the operation and validity of that deed, except the defendant, the agent, who sold the lands, and received the consideration, and who now objects to the title conveyed by that deed. The plaintiff further offered in evidence, that on the 27th day of May 1800, the contract of the 15th of November 1794, between the defendant and *Hall* on the one part, and *M.* and *N.* on the other, was delivered up to the defendant and *Hall*, or one of them, and was thereby cancelled; to prove which, the plaintiff offered evidence that the said contract is now in the possession of the defendant, and is here produced in court by him, and was in his possession on the 1st of March 1803, when he produced it to the plaintiff, and procured it to be admitted by him in and by the paper of admissions herein before set forth. The plaintiff also offered in evidence the agreement of the 15th of November 1794, and the receipt of

(a) The testimony and opinions of the court, as stated in the several bills of exceptions herein before set forth, were read to the jury, and bills of exceptions again taken. The defendant's counsel having made the prayer herein after mentioned, the plaintiff offered the further evidence here stated.

## Margin

MAY 1805

Harper
vs
Hampton

Where a deed, (reciting a power of attorney,) has in the granting part these words "R. G. H. for and as attorney of the said J. R. and in pursuance of the above mentioned power of attorney, hath granted, released and confirmed, and doth grant," &c. and the deed is signed and sealed by R. G. H. attorney for J. R.—*Held,* not to be a valid and operative deed to pass the land intended to be conveyed thereby.

The laws of another state will govern the court in determining on the validity and operation of a deed of lands in that state, if those laws are different from the laws of this state; but in the absence of proof as to what those laws are, the court will decide the question according to the laws of this state.

Where an invalid deed, executed by a principal and delivered to his agent, under which he effects a sale of his principal's land, and enters into a covenant to convey and assure the land to the purchaser the agent is responsible to such purchaser under such covenant.

But if the contract containing such covenant, with the endorsements thereon produced in court, was the original, and was delivered up by the purchaser to the agent, then the agent was discharged from all liability under it.

The jury are to find whether or not there were two or more parts of an agreement executed between the parties thereto, and they are to decide which part was retained by the party claiming under it.

*M.* and *N.* endorsed thereon, bearing date the 27th of May 1800, signed in the hand writing of *M.* and *N;* and also the other indorsements on that agreement; and the circumstance that no evidence has been offered by the defendant to show that two parts of the contract of the 15th of November 1794 were executed, or that any other agreement of the same tenor and date therewith now exists; and also the circumstance that no evidence has been offered to the jury that *M.* and *N.* or either of them, or any person or persons claiming under them, have at any time, since the date of the receipt, set up any claim against the defendant, or *Hall,* or any other person or persons, founded on the contract of the 15th of November 1794; and also offered in evidence, for the purpose aforesaid, the deed from *Hall* and wife to *M.* and *N.* herein before set forth.

The defendant then offered in evidence to the jury the circumstance that no evidence in this cause was offered to the jury that either *M.* and *N,* or any other person claiming under them, ever were, after the 15th of November 1794, in the actual possession of the 150,000 acres of land, for the price of which this suit is brought, or of any part thereof, or ever visited or saw the same, or any part thereof. And then prayed the court for their opinion and direction to the jury, that the deed from the plaintiff to *John Hall,* of the 10th of September 1794, is inoperative in point of law. That the contract of the 15th of November 1794 between the defendant and *Hall* of the one part, and *Morris* and *Nicholson* of the other part, which covenants that "*Hall* and *Hampton,* or either of them, shall by good and sufficient deed or deeds of conveyance and assurance in the law, with general warranty, well and sufficiently grant, convey, and assure the said lands to the said *Morris* and *Nicholson,* and their heirs," has not been complied with by the deed from *Hall* and wife to *M.* and *N.* for the 150,000 acres of land, for the price of which this suit is brought. That this liability created by the contract of the 15th of November 1794 upon the defendant and *Hall*

still exists, and is not done away by the receipt of *M.* and *N.* of the 27th of May 1800.

*Pinkney*, for the defendant. The prayer which has been submitted on the part of the defendant may be reduced to three points:

1. As to the validity of the deed from the plaintiff to *Hall.*

2. If it is an invalid deed it does not convey and assure agreeably to the agreement of the 15th of November 1794.

3. That this covenant is still in operation against the defendant notwithstanding the receipt of the 27th of May 1800.

*First point.* There can be no doubt of the invalidity of the deed. It is executed under a power of attorney from *Rumph*, and is stated to be executed by the plaintiff, in his own name, for *Rumph*, and not in the name of *Rumph*, by the plaintiff as his attorney. It is a rule of law that powers should be strictly pursued. The power says, that the plaintiff should for *Rumph* and in his name, and for and on his behalf, &c. The interest of *Rumph* is not released—it is only the plaintiff's interest which has been released. The power conveyed no interest to the plaintiff—it only authorised him to convey in the name of *Rumph*, all his (*Rumph's*) interest. We do not pretend to say the deed is incorrect by the laws of *South Carolina*; but by the common law it surely is inoperative to transfer the estate in the land.

*Second point.* Being an invalid deed it cannot be a compliance with the covenant. It does not convey and assure the land to *M.* and *N.*

*Third point.* If it is no compliance, the covenant is still in operation. The object for which the notes were retained was for deficiency of land, and the production of papers· was to show if there were any liens, &c. The receipt of the notes was in lieu of such deficiencies, and had nothing to do with the other covenants.

*Harper.* It will be necessary, before this prayer is taken into consideration by the court, to state a few facts which the plaintiff offers to prove. They are, that *M.* and *N.* accepted the deed from the plaintiff to *Hall* as a good and valid deed for the lands; that *M.* and *N.* have since sold the lands; that no person has objected to the operation and validity of the deed, except the defendant, the agent, who sold and received the money; and that the contract between the defendant and *Hall*, and *M.* and *N.* has been delivered up either to the defendant or to *Hall*, and has been cancelled.

*Johnson,* for the defendant. We deny that this is the original agreement retained by *M.* and *N.* there were two parts, one in the possession of *M.* and *N.* and the other in the possession of the defendant and *Hall*—And the plaintiff must prove it is the original kept by *M.* and *N.* before it can be so stated; or state the kind of proof so as to enable the court to say whether it is or is not the original.

*Harper.* The plaintiff offers to prove by the agreement itself, and other circumstances, that it is the original held by *M.* and *N.* and the jury, and not the court, are to judge whether or not it is the original, given up by *M.* and *N.*

The court decide on the competency, not on the effect of evidence.

CHASE, Ch. J. The court are to decide on the competency of evidence, and not on the effect of it.

*Harper,* (after offering the evidence as herein before mentioned by way of addition to the former statement of facts,) proceeded,

*First point.* That the deed is not properly executed, being in the name of the plaintiff, the attorney, and not in the name of *Rumph,* the principal.

There is a material difference between conveyances of lands, and personal contracts; the former are applicable exclusively to the country where the land lies, and the competency of the deed is only to be in-

quired into in the courts of the country where the land lies, and no where else. But in the construction of personal contracts it is different. Hence it results, that this court cannot take into view this deed until it has been acted upon in the courts of *South Carolina.* Suppose a bond given for land sold in *France,* and the obligor sued here, could he say the obligee had no right to the land sold at the time the sale was made? Surely this court could not inquire into that question. The defendant might equally say the grant for the land is illegal, though it purports upon the face of it to be a good grant. This may be a very good deed, and convey a very good title in the state of *South Carolina.* The laws of a foreign country are to be given in evidence to the jury. The plaintiff and defendant resided in the state of *South Carolina,* and the deed was executed there, and it is to be supposed that it was made agreeably to the laws of that state. The defendant took the deed, and with a full knowledge thereof covenanted to perform certain things. This court must presume it a good and valid deed until the contrary appears by decisions thereon in the courts of *South Carolina.* If the subject is cognizable here it is for the jury and not the court. Suppose the courts of *South Carolina* have said it is a good and valid deed, and it will not be denied but they are competent to say so, would it not be evidence to be submitted to the jury? In *South Carolina* a bond of conveyance, with possession of the land, is equivalent to a feoffment, and is a good title. Nothing can be allowed to invalidate the deed but an adjudication to that effect in the courts of *South Carolina.* If such an adjudication has taken place, the defendant is bound to show it, and until he does it will be presumed that there is no such adjudication, and the deed must be considered as valid to pass the land. In *Pennsylvania* any equitable title is good to recover on in ejectment. In that state there is no court of chancery. But the deed from the plaintiff for *Rumph,* and as his attorney, is operative in law. The general principle on this subject is, that the attorney in exe-

cuting his power must act in the name of his princi-
pal.   Not that he must sign the name of his principal
as seems to have been supposed.   *White vs. Cuyler,*
6 *T. R.* 176.   The reason is, that the act must be the
act of the principal not of the attorney.  9 *Coke's
Rep.* 75, 76, *Combe's* case—which rests again on this
idea, that the attorney hath no estate of his own to
convey but only a power to act for another.   But he
acts in the name of his principal, when he declares
in the act itself that it is done for and in the name of
his principal, and by virtue of his authority as attor-
ney.   In other words, that it is not his own act, but
the act of his principal.  9 *Coke's Rep.* 75, *Combe's*
case.   On this case several observations occur: 1.
There is no difference, in reason or law, between such
an act as a surrender and the execution of a deed—
they both rest on the same principle.  2. What is
here said as to leases is a mere *dictum,* the question
did not arise in the case, and no authority has been
cited for it.  3. This *dictum* may well be understood
in the sense for which we contend.  4. If understood
in the other sense, and to be considered as an authori-
ty, it is confined to the case of *leases* by indenture.
5. It is supported by but one adjudication, *Frontin vs.
Small,* 2 *Ld. Raymond,* 1418, which is confined to the
case of *leases,* and it does not appear in what manner
*Martha Frontin* signed the deed.   The presumption is
that she signed in her own name merely.  6. Both
the *dictum* in 9 *Coke's Rep.* and the case of *Frontin.
vs. Small,* are overruled by that of *Wilks vs. Back,*
2 *East,* 142.   But it may be said, that the court in
*Wilks vs. Back,* say that they concur in the decision
of *Frontin vs. Small.*   It may be answered, that one
judge says that he "accedes to the doctrine in the
cases cited," viz. that the attorney must act in the
name of his principal, and not in his own name.   But
to accede to this general principle is not acceding to
its application; and that another judge says "this case
is not like that in Lord *Raymond,* where the attorney
demised to the tenant in *her own name.*"   This is a
mistake in the judge, or it proves that *Martha Fron-*

*tin* signed in her own name merely without stating that she signed as attorney. It may be said, that in *Wilks vs. Back, Browne* the principal was named as an obligor in the body of the bond. But how does it appear? From the manner of making the signature it is to be presumed that the phraseology in the body of the bond was the same. If this supposition were correct it proves nothing. For the signature is the material part. 3 *Bac. Abr.* 409. If this *dictum* in 9 *Coke's Reports,* and the case of *Frontin vs. Small,* be not overruled it is high time that they should be. Why were the old cases relative to mutual and independent covenants overruled? Certainly because they were unreasonable, unjust, and founded on the misapplication of a principle. 4 *T. R.* 764, 765.

*Second Point.* Admitting the deed to be defective, and that this court is competent to say so, is it a breach of the covenant entered into by the defendant and *Hall* with *M.* and *N?*

The covenant is, that *Hall* and *Hampton* shall, within *ten days,* by good and sufficient deeds of conveyance and assurance in the law, with general warranty, well and sufficiently grant, &c. to *Morris* and *Nicholson,* the said lands, &c. By this covenant the deeds were to be given in *ten days* from the date of the contract. The meaning was, that within ten days formal deeds were to be given to *M.* and *N.* so as to put them into possession of the lands, and enable them to make sale thereof in *Europe* on speculation. If it was intended that any other deed than that delivered should be executed, why was it limited to ten days? The covenant was entered into in *Philadelphia,* and *Rumph* and the plaintiff resided, and were then actually in *South Carolina,* upwards of 800 miles distant; so that it was impossible for them to perform the covenant in ten days. The covenant states, that *Hall* and the defendant should make deeds in such form as *M.* and *N.* or their counsel learned in the law, should advise. It did not extend to antecedent deeds. *Hall* and wife did convey, and the deed is in the form prescribed by *M.*

and *N.* or their counsel, and by them accepted—and upon the acceptance of the deed by *M.* and *N.* all liability under the covenant ceased, and the defendant, so far as respected the land of the plaintiff, was no longer responsible under the contract. That the stipulation related merely to the form of the conveyances, and not to the title of the grantors, appears in various ways. 1. From the tenor of the stipulation itself. It is not to convey "*a good title,*" "*a good and indefeasible estate,*" or any thing of that kind, but well and sufficiently to assure and convey, by good and sufficient deed or deeds, "*as they or their counsel learned in the law should advise.*" This confines it to the form. 2. From the time within which it was to be performed, 10 days. 3. From the stipulation for a general warranty in the deeds. 4. From the stipulation respecting title papers, and titles subsequently to be obtained, and the pledge for obtaining them. Many of the titles were well known to be defective. 1. Original grants. 2. Certificates respecting judgments and liens. 3. Conveyances from *Anderson* and *Tate* for 300,000 acres of the land. All this would have been totally unnecessary had the titles been intended to be covered by the contract. If this deed be not operative, yet the acceptance of it by *M.* and *N.* as a good deed, was a waiver of the objection on their part, and released *Hampton* and *Hall* from their liability under the contract of the 15th of November 1794. That they had notice of the manner of executing this deed is manifest, for it is recited, and the manner of its execution stated in the deed to them from *Hall* and wife. That they accepted it, is also manifest from its not being among the papers which were to be supplied under the deposit. The contract was, that the land should be assured to them by such deeds, &c. "*as they or their counsel should direct.*" By accepting this conveyance, they directed it. If there was a mistake, it was their mistake. Can they take advantage of it? Had the deed from *Hall* and wife, drawn under their inspection, been defective in form, could they, after accepting it, have resorted to the contract? Surely

not. *Hall*, by virtue of the covenants in the deed, would have been bound to make further assurance; but the contract would have been satisfied. And they as much assented to this deed as if it had been drawn under their direction, or by their counsel. Their remedy after this assent is—1. Upon the general warranty in *Hall's* deed. 2. Upon the covenants in this deed itself for further assurance; or 3. By bill in chancery against *Rumph* and the plaintiff, to compel them to make further assurance.

*Third Point.* That the covenant is still in operation against the defendant if the deed is considered void, notwithstanding the receipt endorsed on the covenant.

The effect of the receipt, and the delivery up of the original contract between the defendant and *Hall* and *M.* and *N.* is to be judged of by the jury upon the evidence offered to them. If the jury believe it to be the original, once held by *M.* and *N.* then the liability certainly has ceased: But if it is not the original, the effect of the receipt has discharged the defendant from all liability under all the covenants. By the receipt *M.* and *N.* acknowledge to have received a variety of papers, and $27,647 61, "as compensation for any *such* deficiencies, should any appear." The court has said, that the expressions "*such deficiencies*," extend further than to the deficiencies of *papers.* Who is it that can take advantage of this defective conveyance f it is so? Only Col. *Rumph*, and his heirs. Does not *Rumph* and the plaintiff by this suit affirm the sale? And having done so, could they ever afterwards claim the land? They are for ever barred from claiming the land, and a court of equity, if they were to attempt it, would so decree. 1 *Powell*, 315, cites 2 *Vernon*, 151. 2 *Atk.* 19, 20. 2 *Powell*, 34, 35, 36. 2 *P. Wms.* 199. 3 *P. Wms.* 190. There is a moral certainty that this title is good. Nothing has been said to the contrary for upwards of ten years. If there had been any objections to the title, we should have heard something of it before now. The defendant

might have consulted learned counsel in *South Carolina* upon this deed, and he could have produced their opinions in court here, which would be evidence to the jury of what are the laws of *South Carolina* upon the subject. But this covenant to make good titles, &c. was discharged by the receipt of May 27, 1800. The original object of the deposit of notes was merely to enforce the delivery of certain papers. See the receipt of November 21, 1794. The second receipt, that of May 27, 1800, was not confined to the object of the deposit. The term *"such deficiencies,"* is not confined to deficiencies in the papers which were to be delivered. For those deficiencies were far too inconsiderable to absorb the whole deposit. It says, *"such deficiencies, should any there appear."* This could not have been said of the deficiencies of papers which absolutely did appear. Not being confined to the deficiency of papers, it must mean some other deficiencies under the contract. What are they? It is said they are deficiencies in the quantity of land that might appear on the resurvey. But why confine it to this particular deficiency? There is nothing in the words to confine it. *"Such deficiency"* may as well relate to all deficiencies, as to those of a particular description. There is nothing in the nature of the transaction to confine it. The deposit was very large; too large for so trivial and uncertain an object. These notes, though of little value to others, were worth par to *M.* and *N.* who would be ready to make a much greater sacrifice to get them up. *Hampton* and *Hall* were endeavouring by this relinquishment to get as much as they could from *M.* and *N.* They would naturally press to have their whole liability under the contract relinquished. To this *M.* and *N.* would naturally accede. Therefore the reasonable construction of this receipt is that it extended to every claim of *M.* and *N.* under the contract.

*Key*, for the plaintiff. The defendant was the agent of the plaintiff for effecting the sale of the land. If he acted simply as an agent, he is not competent

upon general principles, to impeach his own acts.  A
mortgagor cannot by an act *in pais* defeat the mort-
gage.  The defendant cannot in this case set up an
outstanding title, to prevent his paying the purchase
money of the land sold by him for the plaintiff.  It
is said the defendant is a special agent, and therefore
is not bound to pay over the money until he is gua-
ranteed.  Upon general principles he is bound to pay
over.  But having guaranteed specially, it is said he
must be countersecured before he parts · with the se-
curity he has in hand.  The covenant relied on is,
that *Hall* and the defendant, or either of them, shall
and will, within *ten days*, by deed, assure, &c. to *M.*
and *N.* the lands in such manner as *M.* and *N.* or
their counsel, shall devise, &c.  The deed from the
plaintiff to *Hall* was laid before *M.* and *N.* and their
counsel, for it appears that the deed from *Hall* and
wife to them recites the power from *Rumph* to the
plaintiff, and the deed from the plaintiff to *Hall.*  It
is therefore a deed accepted by *M.* and *N.* as a valid
deed, and consequently is a compliance with the cove-
nant.  By the covenant the deed was to be made
within *ten days*.  It was physically impossible for the
plaintiff and *Rumph*, within the ten days, to make a
valid deed, if the one given was not so.  There is no
evidence that either the vendor or vendee is dissa-
tisfied with the deed.  Shall the agent then be per-
mitted to say it is not a valid deed?  The land has
been sold by *M.* and *N.* and they have since become
bankrupts—neither of them can ever be called on,
and until a recovery is had of them, they cannot call
on the defendant.  Would the defendant have entered
into an impossible covenant, if the deed from the
plaintiff to *Hall* was defective, when he knew that a
valid deed could not be obtained from *South Carolina*
within ten days?  Suppose *M.* and *N.* had sued the de-
fendant upon the covenant for not having made a
valid deed within ten days, would not the defendant
have said, I produced a deed within the time which
was accepted and received as a valid deed, and which
was recited in the deed from *Hall* and wife to *M.* and

May 1805

Harper
vs
Hampton

*N.* The receipt has also released the covenant. It has been by an act *in pais* completely discharged. The covenant is given up with the discharge indorsed on it. These indorsements show, that 27,000 dollars and upwards, were retained for the forth coming of title papers—not of the title papers for the 150,000 acres, by the defendant sold under the authority of the plaintiff—but of the title papers of a great portion of the 904,018 acres sold to *M.* and *N.* by the defendant and *Hall,* and particularly designated. The certificate of *M.* and *N.* as endorsed, states that in fulfillment of the contract above mentioned "we have received," going on to designate the papers, and "accept $27,647 61 as a compensation for *such* deficiencies, if any," &c. as to the other matters in the contract not fulfilled. The court have said the defendant was bound to give the plaintiff, or *Rumph,* notice of the contract of the 15th of November 1794, within eight months, that the resurvey might be made of the 150,000 acres of land, to enable the defendant to call on the plaintiff for the counter security. The defendant being therefore bound to give the notice as to the resurveys, was also bound to give the notice of the defective deed within ten days; and if so, how could the notice be given within that period of time, so as to enable a fulfillment of it on the part of the plaintiff or *Rumph.*

*Martin,* (Attorney General,) on the same side. It is objected by the defendant's counsel that the *escrow* is not valid so as to pass a legal title to the property. That it was by the attorney of Col. *Rumph,* in the name of the attorney, and not in the name of *Rumph,* and that it is the deed of the attorney, and not the deed of the principal by his attorney.

In *Combe's* case, 9 *Coke, 75,* the attorney made the surrender in their own names, and the court said they well pursued their authority. It is sufficient either way, in the names of the attorney or the principal. But they cannot make a *lease* in their own names. 1 *Roll's Ab.* 330, is referred to, but the reference is

not by way of distinguishing the case of a lease from a surrender—for the case in *Roll's. Ab.* turned upon the form of pleading. There was a demurrer. It was pleaded that the attorney did the act, when it should have been pleaded that the principal by his attorney did, &c. Where an agent enters into a contract for his principal, it will bind the principal. *Unwin vs. Wolsely,* 1 *T. R.* 674, *Hodgson vs. Dexter,* 1 *Cranch,* 345. *M·Donough vs. Templeman,* (*Ante* 156.) All the leases of the Lord Proprietary of his lordship's reserved lands, were made by his agents in their own names. Some of them are now in court. One "between the Honourable *Edward Lloyd,* Esquire, Agent and Receiver General of the Right Honourable the Lord Proprietary of the Province of Maryland, for and on behalf of the said Lord Proprietor, of the one part," &c. &c. "Hath with the consent of his Excellency *Horatio Sharpe,* Esquire, Governor and Chancellor of this Province, demised," &c. Another executed by Mr. *Tasker,* as Agent of the Proprietary, in which the same form is pursued. And other similar leases by other agents, all of them signed and sealed by and in the name of the agent. These leases have all been considered, by the most able counsel in *Maryland,* as complete and formal, and valid to pass the interest of the Proprietary. Many actions of ejectments have been tried and such leases produced and read as part of the title papers in the cause, without any objections. Such was the case in *Russell vs. Baker,* (*Ante* 71,) where a lease of the agent of the Proprietary is introduced, and constitutes a part of the title in the case, as stated in the bills of exceptions (a). In *Hodson vs. Dexter,* and *M·Donough vs. Templeman,* the parties did not sign for their principals, nor did they sign as agents or attorneys for their principals. And in the proprietary leases, the agents simply signed their own names, without the addition of its having been so signed for the Lord Proprietary. These instruments have all been considered the act and deed of the principal. But in *Par-*

(a) See *Gilbert vs. Lee,* 4 *Harr. & M·Hen.* 487.

*ker vs. Kett*, 1 *Salk.* 96, it is said to be *more regular* for the attorney to act in the name of the principal. Not that it *must* be done in the name of the principal, or that it is not legal if otherwise executed. So in 1 *Bac. Ab.* tit. *Authority*, 202, it is stated, that where a person is authorised to do a thing, it is *more regular* to do it in the name of the principal. Here the deed is signed *"Robert G. Harper*, attorney for *Jacob Rumph,"* and the counsel for the defendant say it should be *"Jacob Rumph*, by *Robert G. Harper* his attorney." Where is the difference? The signification is precisely the same. There is no particular form necessary. In *Wilks vs. Back*, 2 *East*, 142, it is signed *"Mathias Wilks,"* (L. S.) *"For James Browne, Mathias Wilks."* (L. S.) The court said it was immaterial whether the attorney put his name first or last—that there was no particular form of words to be used, provided it was done for the principal. This case in *East's Reports* refers to 2 *Ld. Raymond*, 1418, and in that case the suit was brought in the *name of the attorney*, and the declaration states that the lease was made by the attorney for the principal, instead of saying that the principal, by the attorney, made the lease. The question did not occur whether the lease had been properly made; for that question could not occur unless the suit had been in the name of the principal, and the lease declared upon as the lease of the principal by his attorney. The same case is reported in *Stra.* 705. The court will give every possible construction to a feoffment so as to give it effect and validity—10 *Mod.* 35. Should this court decide that this is not a good and valid deed by the common law, or the laws of this state, it will not affect the deed, if by the laws of *South Carolina* it is considered good and valid. Suppose this court were to decide that it is not a valid deed, and that the plaintiff has no right to call on the defendant for the money— And suppose a suit instituted in *South Carolina* to recover possession of the land by the person claiming under the deed, and the courts of that state were to decide the deed to be sufficient to pass the estate,

would not the plaintiff be entirely without redress? It is not the intention of the defendant to place the plaintiff in the situation he was before the sale of his land; but it is his intention to leave him without either money or land. This distinguishes the present from the case in 2 *Atkyns*—there the party had a remedy.

If the deed is defective, the defendant is not liable to be called on under the covenant by him entered into with *M.* and *N.* There is no covenant to convey any estate which is indefeasible. *Hall* and the defendant were themselves to give a general warranty, clear of incumbrances from any claim by mortgages or judgments—this is provided for by a retention of notes to answer incumbrances, &c. If any defect of title appeared, it was guarded against by the covenant. It was not a covenant to guard against a defeasible estate. If an indefeasible estate was to be made within ten days, and the title was defeasible, an action might have been brought immediately after the expiration of the ten days. The deed was accepted by *M.* and *N.* who had, no doubt, the best and most able counsel—and upon their acceptance of the deed the liability ceased. The defendant, when he entered into the covenant, knew the deed was good; or if he knew it was not, he entered into an impossible covenant, and therefore not binding on his principal, for he well knew it could not be performed either by himself, (for he had not the title,) or by his principal, who was several hundred miles off. This is an ingenious defence set up by the counsel of the defendant, and which he himself never thought of. He did not make the deed to *M.* and *N.* it was made by *Hall.* All the covenants having been performed, there remained no reason for keeping the agreement, and *M.* and *N.* have given it up to the defendant, and there is abundance of evidence sufficient to induce the jury to presume it is the original which had been left with *M.* and *N.* if indeed two parts had ever been executed.

*Mason,* in reply. There are responsibilities which the receipt does not provide for. The first clause in

the agreement is, that *Hall* and the defendant shall, by good deed, grant and assure to *M.* and *N.* &c. as they or their counsel learned in the law, shall advise, &c. Suppose the deed from the plaintiff to *Hall* is void, does a void deed satisfy this covenant? Nothing passed by the deed from *Hall* to *M.* and *N.* if the deed from the plaintiff to *Hall* was void. The manner and form of the conveyance is the province of the counsel learned in the law; they were not to examine into prior existing titles. If the deed from *Hall* to *M.* and *N.* is defective, it is their fault. But if the title to the land, upon which the deed operated, was not in *Hall*, the covenant in the agreement is not fulfilled, and it is a breach thereof, for which the defendant is responsible to *M.* and *N.* and against which the plaintiff is bound to guaranty the defendant. Suppose *Rumph* had conveyed the whole land away previous to the power to the plaintiff, could the covenant be then said to be fulfilled? It is certain that within ten days no deed could be re-executed in *South Carolina.* The defendant considered the deed delivered to him as an *escrow*, to be a valid deed. It was through friendship for the plaintiff he covenanted for him, under the assurance of its validity, having no suspicion of the defect. The plaintiff was a counsellor, supposed to be learned in the laws of *South Carolina,* and drew the deed himself. It is not supposed that he knew of the defect, and that he designedly intended to entrap the defendant. It was a mere mistake by the plaintiff, and it cannot be contended that his mistake shall operate against any other person to his own benefit. It does not follow, from *M.* and *N's.* having neglected to seek, or proceed upon the covenant before now, that they cannot or will not hereafter do so—or that some person, claiming under them, will not. The defect of title has not yet been discovered by them, or those claiming under them; when it is, there can be no doubt but the covenant will be enforced. It has been said that an agent cannot question the authority under which he acted. Surely an agent has a right to be indemnified. There has as yet

been no counter security tendered to the defendant. When that is done, the defendant will have no right to withhold the money; but until he is countersecured, in justice to himself he holds the money to protect himself against any possible claim which may be made upon him. If the deed is defective, the defendant, upon being countersecured, will be bound notwithstanding to pay the money to the plaintiff. And the court have said, if the plaintiff had notice of the contract, the defendant was not bound to pay unless he was countersecured. If the deed is void, the question then is, does the receipt embrace the covenant relative to the assurance of the land, and relinquish and discharge all responsibility under that covenant? The receipt for $27,647 61, as a compensation for any *such deficiencies,* should they appear, alludes to that part of the contract relative to resurveys, and the deficiencies which might appear in the quantity of land and liens upon the estates, and did not relate to any defect of title. Would *M.* and *N.* accept $27,647 61, as a full discharge of all the covenants, as a compliance with a covenant to assure so large a body of land as 904,018 acres, for it went to the whole purchase? They surely would not run such a risk. This will show that the meaning was merely that the receipt should relate to deficiencies in the quantity sold, and liens on the lands.

*Pinkney,* also in reply. It is not necessary for the defendant to show that there has been any claim or demand against him upon the covenant. It is not to be inferred that because it has not been brought forward that it will not. The plaintiff himself for a number of years abandoned his claim, and considered it as entirely at an end. He now brings it forward, and expects to recover. It shows that a person should be constantly on the watch, and have it in his power at all times to repel a claim, though ever so stale. The defendant having pledged his personal responsibility, the plaintiff is bound to secure him, and until he does the defendant cannot be called on. The reason and equity of the case is surely on the

side of him who will not relinquish until he is protected against the possibility of danger. Why has not the plaintiff substituted himself in the place of the defendant to answer the covenants to *M.* and *N?* He is to derive a benefit, and he ought not to do so to the prejudice of the defendant.

The actual point in controversy is upon the deed, and we contend that it is void and inoperative in point of law. It has been said that it may be void here but not in *South Carolina.* To show that it is void in *South Carolina,* it is only necessary for the defendant to show it is so by the common law. The common law is in force in that state, having been one of the *British* provinces. The plaintiff's own letters to the defendant show that the laws of *South Carolina* are similar to our laws. We have here in court the laws of that state, and they are silent upon this subject. Hence it is to be concluded that the common law must govern this question. The case stands upon general principles, that he who is to execute an authority must pursue it strictly. It is a principle of justice and common sense. The *lex loci,* it is said, must govern this case, and that unless the deed comes directly in issue, the court cannot notice it. Suppose a man in *England* sells land, and there are two bonds taken, one to pay the purchase money, and the other to convey the land—and upon suit being brought on the bond to recover the purchase money, the defendant pleads that the plaintiff had not tendered a good and valid deed for the land—the court must say whether a tender of a valid deed had been made agreeably to the laws of *England,* otherwise the plaintiff would be precluded from a recovery. Because the laws of another country comes incidentally into view, must the court be precluded from taking cognizance of the case? By the common law a deed of conveyance made by an attorney for his principal is void if the attorney grants in his own name. 3 *Bac. Ab.* 408. tit. *Leases made, &c.* Leases made by an attorney, under a power, must be as if made by the principal—for if made by the attorney, though he states

that he does it as attorney, they are void. Leases made by an attorney, differ from surrenders made by an attorney. An attorney may surrender in his own name—but he cannot lease in his own name for his principal. *Bacon* refers to *Combe's* case in *Coke's Reports.* That was the case of a surrender by an attorney. The cases of surrender and lease are here put in contradistinction of each other. In 2 *East,* 142, the bond there was in the name of both of the partners, and the question was upon its execution, whether the attorney sealed and delivered the bond in the name of and as the act and deed of his principal? The objection taken by the counsel in the case in *Raymond* was to the *lease,* and not to the declaration; and the court said, "upon the face of the declaration the lease was void," meaning a lease so made was null and void. The case of a surrender being a mere ministerial act, and of no consequence, is therefore different from a lease. The case in *Strange* is the same as the one in *Raymond.* The deed from the plaintiff to *Hall* being a release, recites the lease for a year which preceded it, and it is not stated that he had made the lease as attorney for *Rumph.* We have not the lease here, and it is to be presumed the lease is correctly recited in the release; if so, he appears to have made the lease without stating his authority. The case in 1 *T. R.* 674, has nothing to do with the one at bar. It is not whether a power granted has been pursued; but how far the plaintiff bound himself personally. So in the cases of *Hodgson vs. Dexter,* and *M•Donough vs Templeman.* It was not in the first case whether the government was bound—for an individual cannot bind the government; but it was how far the contract was a personal one on the part of the agent. And in the last case it was how far it was a personal covenant on the part of *Templeman.* The case in 10 *Modern,* 35, was upon the construction of powers arising before the statute of uses. With respect to the proprietary leases, it has not been shown that any judicial decision has taken place upon any of them. It may be that the courts have permitted

MAY 1805

Harper
vs.
Hampton

them to be read for the purpose of quieting possessi-
ons. The Lord Proprietary did not grant as an or-
dinary individual—His agents were not attorneys par-
ticularly authorised for the special purpose of leasing
his manors. They had large and extensive powers,
A question, similar to the one now before the court,
was argued in this court many years ago, and pro-
bably decided. The name of the case in which the
question arose is not recollected, but if found it might
assist the court in the present question *(a)*.

*(a)* The following case is probably the one alluded to by Mr.
*Pinkney*.

*Where a deed, and a power of at-torney, in virtue of which the deed was executed, were held not to be a good and sufficient convey-ance in law so as to vest the title in the land, transfer-red by the deed and power of at-torney .*

*Smith's* Lessee vs. *Perry.*    General Court October Term, 1783    Ejectment for a tract of land lving in *Charles* county, called *Morris's Discovery. Verdict* for the *defendant,* subject to the opinion of the court on the following *point saved:* The plain-tiff showed a title in fee simple in himself to the land in question. The defendant, to prove the title in the lands out of the plaintiff, and vested in himself in fee simple, produced a deed dated the 16th of August 1770, stated to be made "by and between *Joseph Hanson Harrison* of *Charles* county," &c. "of the one part, and *Thomas Perry* of the said county," &c. "of the other part," reci-ting that a certain *John Smith* of the county aforesaid, did on the 1st day of September 1767, execute a power of attorney to the said *J. H Harrison,* constituting and appointing the said *Har-rison* his true and lawful attorney, to sell and convey in fee sim-ple all that messuage, &c and parcel of land, lying and being in *Durham* parish, in the county aforesaid, relation to the said pow-er of attorney being had may more fully and at large appear;" and that the said *Harrison,* for and in consideration of the sum of £42 current money to him in hand paid. did *in virtue of the said power of attorney* give and grant, &c. unto the said *Perry* and his heirs, the land mentioned in the declarat on in this cause.   This deed was signed, sealed and delivered, by *Harrison* in his own name alone; and as "attorney in fact for *Smith,*" was acknow-ledged on the 16th of August 1770, and on the 12th of Decem-ber 1770 duly recorded. The defendant also produced the power of attorney executed on the 1st of September 1767, by *Smith,* constituting *Harrison* his attorney for him and in *his name,* and to his use, to lease or sell all that tract of land called *Morris's Discovery,* &c. The *power of attorney* was proved by the two subscribing witnesses on the ——, of June 1774, before two justices of the peace for *Charles* county, and recorded amongst the records of the said county on the 15th of June 1774. It was admitted that the land mentioned in the power of attorney, and in the deed, and the land in question, was one and the same. The question submitted to the court was, whether the deed and power of attorney constituted a good and sufficient conveyance in law, so as to vest the title in the land, transferred by the deed and power of attorney. If the court were of opinion that they did, then judgment was to be entered for the defendant. But if the court should be of a contrary opinion, then there was to be judg-ment for the plaintiff for possession and costs.

*T. Stone,* for the plaintiff.
*J. Hall,* for the defendant.

THE COURT, [*Harrison,* Ch. J. and *Hanson,* J.] gave judg-ment for the plaintiff on the *point saved.*

It has been said that a court of equity would inter-
pose and compel *Rumph* to make a valid deed. It is
admitted the notes of *M.* and *N.* have never been paid
by them. Would a court of equity relieve *M.* and *N.*
and compel *Rumph* to convey when it could be made
appear their notes had never been paid? Suppose *M.*
and *N.* were to proceed at law to recover possession
of their lands. (for it is agreed that there are a num-
ber of tenants on the land holding adverse to the title
of *M.* and *N.*) could they recover on this defective
deed? It is well understood that the defendants, be-
ing in possession, would have a good case unless the
plaintiff made out a good title, and in the first step
*M.* and *N.* would be defeated. Could they get a bet-
ter deed in a court of equity not having paid the pur-
chase money? Surely not—It cannot be contended
they could. In the case in *Powell* the consideration
money had been paid, and a court of equity would in-
terpose where that had been the case. *Hall* and the
defendant covenanted that they would sufficiently con-
vey and assure the land to *M.* and *N.* How do they
satisfy this covenant if the act when done does not as-
sure the land? If the agent introduces a fraudulent
covenant, he cannot secure himself under it. If the
defendant has made an impossible covenant he has
been entrapped into it by the act of the plaintiff. He
placed implicit confidence in the superior legal talents
of the plaintiff, and supposed that the deed had been
correctly drawn. The covenant has two parts—1st.
Well and sufficiently to assure the lands; and 2d. to
make good all deficiencies, &c. The receipt is in lieu
of all such deficiencies, &c. There must have been
more than one agreement executed. There are mu-
tual covenants equally beneficial to, and binding on
both parties, and therefore required two parts. They
all sign in order to bind all of them. Upon the face
of the contract it may be presumed that there were
two parts; that *M.* and *N.* had one part; and *Hall* and
the defendant had another. An *indenture* necessarily
implies more parts than one—A deed of *bargain and*
*sale* is necessarily an indenture, and binds and benefits

MAY 1805

Harper
vs
Hampton

one party only. It is obliged to be recorded, and a copy is evidence. If the original left in the possession of *M.* and *N.* was given up, why endorse the long receipt which we see upon the one produced? It must be admitted it can be cancelled without an endorsement of satisfaction, if it is in the hands of him against whom it is to operate, unless there is proof it was obtained unfairly.

CHASE, Ch. J.(a). Upon the statement of facts which are contained in the several exceptions which have already been taken in this case to the opinions of the court, and the additional facts now stated by the counsel for the defendant and plaintiff respectively, the counsel for the defendant have prayed the court to direct the jury in the following manner:

*First.* That the deed from *Robert Goodloe Harper* to *John Hall* of the 10th of September 1794, is inoperative in point of law.

*Secondly.* That the contract of the 15th of November 1794, between *Wade Hampton* and *John Hall,* of the one part, and *Robert Morris* and *John Nicholson,* of the other part, which covenants that *Hall* and *Hampton,* or either of them, shall by good and sufficient deed or deeds of conveyance and assurance in the law, with general warranty, well and sufficiently grant, convey and assure, the said lands to *Morris* and *Nicholson,* and their heirs, has not been complied with by the deed from *John Hall* and wife to *Robert Morris* and *John Nicholson,* for the 150,000 acres of land, for the price of which this suit is brought.

*Thirdly.* That the said liability created by the said contract upon *Wade Hampton* and *John Hall* exists, and is not done away by the receipt of *Robert Morris* and *John Nicholson* of the 27th of May 1800.

The court in forming their opinion on the several questions which have been referred to them, have adverted to and considered the cases which have been cited, and the able and ingenious arguments which have been urged by the counsel in the discussion of these questions, with that attention they deserve, dur-

(a) Done J. absent. *Sprigg,* J. concurred.

MAY 1805

Harper
vs
Hampton.

ing the short interval which could be so appropriated since the rising of the court on Saturday. To make a good and valid deed to transfer lands in this state, the deed must be executed by the grantor, or by his attorney empowered for that purpose. If it is made by attorney, the authority derived from the principal must be pursued, and the deed must be in the name of the principal. The attorney, under and by virtue of the power to him, acquires no right to, or interest in the lands, and therefore in his own name cannot convey any. *Combe's* case, 9 *Co.* 76, which is the first case on the subject, was a surrender of copy hold lands, by attorneys empowered by the tenants to make the surrender for him and in his name. The surrender is made of copyhold lands, by delivering a rod, or other symbol, to the steward of the manor, without any deed or other writing. So livery of seisin is made by delivery of a twig or turf on the land, which is the evidence of the transmutation of the possession from the feoffer to the feoffee, and no writing is required. These cases are distinguishable from a lease or deed. Upon recurring to the power of attorney from *Jacob Rumph* to *Robert Goodloe Harper,* it appears he was empowered to sell the lands, and to convey them *in the name* of *Jacob Rumph* as his attorney. The deed in the granting part is in the following words: *"Robert G. Harper,* for and as attorney of the said *Jacob Rumph,* and in pursuance of the above mentioned power of attorney, hath granted, released and confirmed, and doth grant," &c. and the deed is signed and sealed by *Robert G. Harper,* attorney for *Jacob Rumph.* The question is, whether this deed is valid and operative to pass the lands to *John Hall?* The court are of opinion it is not; inasmuch as the authority has not been pursued, it being the deed of the attorney and not of the principal, not being in his name in the granting part. This case is exactly similar to the case of *Martha Frontin vs. Small, (Raymond,* 1418.*)* In that case she set forth the agreement in the declaration, and declared that she, for *and in the name and as attorney*

for *James Fronten*, *demised;* and the court, on demurrer to the declaration, determined that the lease was void, because it was not made in the name of *James Frontin*, whose house it was—and that the defendant was not liable to pay the rent. In the case of *Wilks*, and another, *vs. Back*, *(2 East*, 142,) the doctrine in *Combe's* case, (the second resolution,) and *Frontin vs. Small*, is acceded to by the court, that the attorney must execute the deed in the name of the principal, and not in his own name. In both those cases the court decided that the deed must be in the name of the principal, and that if in the name of the attorney it is void. In the case in 2 *East*, the only question was as to the signature. *Browne* was named as an obligor in the bond, and *Wilks* was empowered to sign, seal, and deliver the bond for him. He did sign, seal, and deliver the bond for *Browne*, but in signing, the attorney put his own name first—*Wilks for Browne;* and the court determined it was the signature of *Browne*, and the manner of placing the names made no difference—which was the only question before the court. And judge *Lawrence* said, it was not like the case in *Raymond's* Reports, where the attorney *demised* to the defendant in her own name, which she could not do, for no estate could pass from her. As to the laws of *South Carolina* governing this question.—No doubt the laws of *South Carolina* must govern the court in determining on the validity and operation of this deed, if they are different from the laws of this state; but no proof has been adduced to prove that the laws of *South Carolina* will make this a good and valid deed—and without proof, the jury cannot find what the law of *South Carolina* is. The circumstances stated by the plaintiff are not evidence to warrant the jury in finding what the law of *South Carolina* is in relation to this subject. The question has arisen incidentally in an action for money had and received, and the court must decide it according to the laws of this state; and are of opinion it must be considered as a void and inoperative deed, according to the laws of *South Carolina*, as to any question arising on it in this case.

As to the second question respecting the defendant's liability under the contract of the 15th of November 1794. The court are of opinion, that as the deed from the plaintiff to *John Hall* is not valid to pass the lands to him, the defendant is responsible to *Morris* and *Nicholson* under the covenant in the contract that *Hall* or *Hampton* should convey and assure the land to them by a good and sufficient deed; and that the receipt of the 27th of May 1800, endorsed on the contract only, exempted the defendant from his responsibility as to any deficiency of land which might have appeared on the resurvey; the deposit being retained by *Morris* and *Nicholson* as a compensation for such deficiency. But the court are also of opinion, that if the jury should find, that the contract of the 15th of November 1794, with the endorsements thereon, produced and read in evidence, was the original agreement between the parties, and that the same was delivered up by *Morris* and *Nicholson* to the defendant, at the time of giving the receipt, or if the jury should find that there were two or more parts of the agreement executed by the parties at the time, and the court are of opinion that the agreement itself affords *prima facie* evidence that there were more than one, there being stipulations contained in it to be performed by each party, and that the one now produced was the part delivered to *Morris* and *Nicholson*, that in such case the defendant was discharged from all liability under the contract from the time the same was delivered up.

The chief judge observed, that as to the case of *Hodgson vs. Dexter*, the court suppose it was decided upon the principle, that whenever an agent for the government enters into a contract for the government, he is not answerable in his own name, unless it is stipulated in the contract that he shall be personally liable. In the case of *M'Donough vs. Templeman*, the opinion of this court was given on this ground; that *Templeman*, being an agent for a private company, unless he had a power of attorney to authorise his acts, he was personally liable. The court made a dis-

*Quere.* Whether the leases entered into by the agents of the proprietary were sufficient to transfer his interest in the lands leased?

tinction between public and private agents. The plaintiff excepted.

*Martin,* (Attorney General,) suggested that the court had taken no notice of the proprietary leases.

CHASE, Ch. J. said, there had never been any decision upon the proprietary leases, that he knew of; and until the question came before the court upon any of those leases, they would give no opinion on them.

Where an agent had entered into stipulations for his principal for which he was to be countersecured and the persons to whom the stipulations were made have never set up any claim, &c. the agent may nevertheless avail himself of a nonfulfillment by his principal in giving the counter security.

12. *The seventh bill of exceptions.* The plaintiff then prayed the court for their opinion and direction to the jury, that if the jury are of opinion from the evidence in the cause, that *Morris* and *Nicholson,* and those claiming under them, have been satisfied with and never objected to the validity and operation of the deed from the plaintiff, as attorney of *Rumph,* to *Hall,* or to the deed from *Hall* and wife to *Morris* and *Nicholson;* and that neither the plaintiff nor *Rumph* have, at any time since the execution thereof, ever set up any claim to the lands, or any part thereby conveyed; and that no demand or claim has been made on the defendant, under his contract of the 15th of November 1794, that then the defendant cannot avail himself of any objection to the validity of the deeds, set up by himself during the trial of the cause, to prevent payment over of the money by him received to the plaintiff, unless he gave notice to the plaintiff or *Rumph,* before the institution of this suit, that the said deeds were invalid and inoperative in law.

*Harper.* The defendant was bound to take notice of the defect in the deed. He knew that *Rumph,* or the plaintiff, alone could remove it, and that either of them could remove it in a moment. If nothing was said about the defect, they had a right to conclude that it was waived. Nothing can be more unreasonable or unjust, than to allow him to lie by till he is called upon for the money, and then avail himself of this defect to keep it for himself.

CHASE, Ch. J. The court refuse to direct the jury agreeably to the prayer of the plaintiff. The plaintiff excepted.

MAY 1805

Harper
vs
Hampton

13. *The eighth bill of exceptions.* The plaintiff, in addition to the preceding statements, also gave in evidence to the jury, that at the time when the contract between *Morris* and *Nicholson*, and *Hall* and the defendant, was executed in *Philadelphia*, the plaintiff was resident in *Charleston*, *South Carolina*, and continued there until long after the tenth day from the date of that contract; and that *Rumph* was also at that time living and residing at *Orangeburgh*, and that *Orangeburgh* is 720 miles from the city of *Philadelphia*; and that *Charleston* is distant from *Philadelphia* 763 miles; and that the defendant remained in *Philadelphia* until the 27th of November 1794. That *Hall* was also residing in *Philadelphia* at the time when the said articles of agreement were entered into, and on the said 27th of November 1794. That *Morris* and *Nicholson* were at the city of *Philadelphia* at the time when the said contract was entered into, and remained there until the expiration of ten days and upwards.

The defendant then offered evidence to the jury, that the plaintiff on the 20th of August 1794, for some time before, and for some years next after, was a lawyer by profession, and a practitioner in the courts of the state of *South Carolina*.

The plaintiff then prayed the opinion of the court, and their direction to the jury, that supposing the covenant entered into by the defendant and *Hall*, on the 15th of November 1794, in these words: "that for the consideration herein after covenanted to be paid to the said *Wade Hampton* and *John Hall*, by the said *Robert Morris* and *John Nicholson*, they the said *Wade Hampton* and *John Hall*, for themselves, their heirs, executors and administrators, do covenant, promise and agree, to and with the said. *Robert Morris* and *John Nicholson*, their heirs and assigns, that they the said *Wade Hampton* and *John Hall*, or either of them, shall and will, within ten days from and after the date here-

*Where notice is necessary to be given by an agent to his principal; and where the jury may presume that it had been given.*

of, by good and sufficient deed or deeds of conveyance and assurance in the law, with general warranty, well and sufficiently grant, convey, and assure unto, and to the only proper use and behoof of them, the said *Robert Morris* and *John Nicholson,* their heirs and assigns, as they, or their counsel learned in the law, shall reasonably devise, advise or require, 904,018 acres of land, situate in the districts of Orangeburgh, Camden, Cheraw and Washington, in the said state of South Carolina, together with the appurtenances, free and clear of all incumbrances whatsoever," to be in force and outstanding, and to bind the defendant for the making, within ten days, a good title for the 150,000 acres of land, to *Morris* and *Nicholson*—Yet the same cannot be set up in bar to the plaintiff's claim in this case, unless within ten days after entering into that covenant, notice thereof was given to the plaintiff or *Rumph,* so that one of them might be enabled to convey and perfect, within ten days, the title of the lands so sold, in *Morris* and *Nicholson,* and thereby to prevent a breach of the said covenant.

*Harper.* It cannot be doubted that the plaintiff and *Rumph* had a right to perform the stipulation themselves, and thereby free themselves from the counter security. It is therefore the same as if the defendant had stipulated that they should do the act. Indeed they alone could do it. It could not be done after the ten days, *M.* and *N.* having then a right to refuse. For this was clearly a condition precedent. The plaintiff and *Rumph* ought therefore to have had notice within the time, and if the defendant omitted to give it, he cannot avail himself of the liability which he thus prevented them from removing. *Hotham vs. The East India Company,* 1 *T. R.* 638, 645. This doctrine applies to all parts of the contract, but with most force to this part. Because the defendant and *Hall* might have fulfilled all the other parts, but this could only be fulfilled by the plaintiff or *Rumph.* But it will be said, that here the notice was impossible. The answer is, that it was the defendant's

fault to make it so. He was bound to take notice of the defect in the deed. He knew that none but the plaintiff or *Rumph* could remove this defect; and he also knew that they were both in *South Carolina.* There were various ways in which he might have avoided making such a stipulation. It was his folly to make a stipulation which he knew it would be impossible for him to perform, and surely he ought to bear the consequences of this folly. 1 *T. R.* 642, 644.

CHASE, Ch. J. The court are of opinion that it was necessary that the defendant, or *Hall*, or *Morris* and *Nicholson*, should have given notice to the plaintiff, or *Jacob Rumph*, of the covenant contained in the contract of the 15th of November 1794, within ten days from the execution thereof; and the court are also of opinion, that the facts stated in this case are competent and sufficient evidence for the jury to presume and find, that the plaintiff in this cause had notice, within ten days from the execution of that contract, of the covenant specified therein, and herein referred to.

*Martin,* (Attorney General,) observed, that none but an angel on the wings of the wind could give notice in ten days at such a distance.

CHASE, Ch. J. informed the attorney general, that he had a right to take an exception to the opinion of the court, but that he had no right to make any observations which tended to reflect on the court, or to induce by-standers to believe the court had been guilty of an absurdity. That Mr. Attorney had been too much in the habit of such conduct, and he was, so far as related to himself, determined to submit to it no longer; that as long as he held a seat on the bench, (and he did not know how long that might be,) he was resolved to have a proper respect paid to the court. He could not conceive what the distance of *South Carolina* from *Philadelphia* had to do with the opinion of the court.

*Harper.* We wish to precede the prayer, upon which the opinion of the court has just been given, with a few additional facts. He then stated the facts as they appear preceding the prayer last made.

CHASE, Ch. J. confessed that he had been under a mistake; that in forming his opinion he had supposed the plaintiff was in *Philadelphia* when the contract was entered into. This will give a different complexion to the case—and the court withdraw the opinion just given.

The court wish to hear counsel upon the point of notice; whether the plaintiff, having placed himself out of the reach of notice, he was entitled to it? And whether it was necessary at all for the defendant to cause the plaintiff to have notice of the covenant, as the defective deed upon which the covenant was entered into had been delivered by the plaintiff?

Where notice is not necessary to be given by an agent to his principal.

*Harper.* In point of law every person is bound to know the operation of deeds affecting himself. The defendant had the deed, he was bound to know its defects, and should not have entered into an impossible covenant. The defendant was *not bound* to enter into such a covenant. He was not bound to enter into any covenant at all. But if it should be deemed necessary, and he should judge them to be reasonable and proper covenants, he might enter into them. There is no proof that it was absolutely necessary to enter into the covenant for the sale of the plaintiff's land. The defendant sold other lands, and *it might have been necessary* for the sale of his own lands that such a covenant should be entered into—And shall it therefore bind the plaintiff? But the defendant has entered into an impossible stipulation—such a one as totally to prevent the plaintiff, if he is bound to perform it, from recovering the money of the defendant which he has received. Thus by an act of his own, and which it was not in the power of the plaintiff to control, he benefits himself to the prejudice of the plaintiff. Notice in fact, is a notice of the fact itself.

MAY 1805

Harper
vs
Hampton.

Notice in law is that knowledge which the party will be presumed to have from the circumstances of the case. How could the defect of the deed be remedied unless notice was given? And as it could not be done within ten days, it amounted to no covenant at all. Suppose *M.* and *N.* were willing to accept a compliance with the covenant at any time after the ten days, the plaintiff must have notice so as to perfect the title. This notice he never had. The plaintiff or *Rumph* were competent to make a release; this they would have done if notice of the defect of the deed had been given.

*Martin,* (Attorney General,) he had reason, he said, to presume the court were acquainted with the fact, that the plaintiff was in *South Carolina* when the contract was entered into. The counsel had argued upon the impossibility of complying with it in the ten days. The defendant having executed the contract, he was bound to know the legal effect of it. There was no obligation on his part to make a sale of the plaintiff's land, or to enter into any warranties. It was merely to be a matter of convenience and discretion in him; and if he should sell the land, and enter into warranties and guaranties, the plaintiff would countersecure and indemnify him. But did this mean that he should enter into impossible covenants, receive the money, and then himself set up such impossible covenant, to prevent payment over of the money? The defendant has not sold the plaintiff's land specifically, but sold it in a mass with his own and *Hall's* lands. He enters into no stipulations specifically concerning the plaintiff's land. The defendant ought to show he was compelled to enter into the covenant for the benefit of the plaintiff. We can see nothing which can justify him for having done so. Had it been a general warranty, the covenant could have been complied with by giving a good deed with a warranty.

*Pinkney,* contra. The principal stipulates, that so far as the agent will enter into covenants he will counter-secure him, and places into his hands the title deed. There is an inevitable presumption that the defendant was compelled to enter into the guaranty, as he would not have entered into it unless he was obliged to do so, in order to make sale of the land. It cannot be supposed he would stipulate further than was necessary from the very circumstances of the case—for no man, it is to be presumed, will push his responsibility further than may be absolutely necessary. The plaintiff did not limit the defendant—there is no *ne plus ultra.* He had authority to enter into any warranty or guaranty by the letter of the contract with the plaintiff, and as an innocent agent, pursuing his authority, should be indemnified. Whether the covenant is impossible or not he who first created the covenant should abide by it, and not the innocent agent. The deed was drawn by the plaintiff, and the defendant placed implicit confidence in the honour, knowledge, and legal and political abilities of the plaintiff, and the world has had ample reasons to believe that such confidence was not misplaced.

CHASE, Ch. J. The opinion of the court was given before on the supposition that it was incumbent on the defendant to give notice of the guaranties by him entered into, before he could claim counter indemnity from the plaintiff. I had supposed that the plaintiff was in *Philadelphia* at the time the contract was entered into between *Hall* and the defendant with *Morris* and *Nicholson;* in this I was mistaken.

The question now is, whether the defendant was bound to give the plaintiff notice in ten days to avail himself of the counter indemnity and security which the plaintiff had engaged to give by his contract with the defendant.

The defendant supposed the deed from the plaintiff to *Hall,* and which was delivered over to *Morris* and *Nicholson,* was a good and effectual deed; in that he was mistaken. The contract between the plaintiff and

the defendant was predicated upon the idea of a good and valid deed; so was the contract with *Morris* and *Nicholson*; and the defendant acted as a friend, and gratuitously, and in the same manner as he acted for himself in the sale of his own lands. He was empowered to enter into contracts to assure the land. The deed given to *Morris* and *Nicholson* to convey the land, not being a good and valid conveyance, if the court were to decide that under this part of the contract the defendant was bound to give notice which was impossible, the defendant would be stripped of the advantage of the engagement entered into, by the plaintiff to countersecure and indemnify him. The plaintiff might have given these counter securities and indemnities before the contract between the defendant and *Morris* and *Nicholson* was entered into. If the court were to say the notice was necessary to be given within ten days, it would preclude the defendant from the benefit of claiming his counter security and indemnity. The court therefore refuse to give the direction as prayed. The plaintiff excepted.

14. *The ninth bill of exceptions.* The plaintiff, in addition, &c. also offered in evidence to the jury. that during the trial of this cause, to wit, on this 21st of May 1805, he tendered to the defendant a bond of indemnity, bearing date the 21st of May 1805, with *Charles Carroll*, of *Carrollton*, Esquire, security, in the penalty of $25,000. [which was not objected to as to form;] and that the bond was then refused by the defendant. He further offered in evidence, that *Charles Carroll*, of *Carrollton*, the obligor in the said bond mentioned, is sufficient and able to pay the said sum of $25,000; and then prayed the opinion of the court, and their direction to the jury, that if they believe the facts so offered in evidence, then the said tender and refusal of said bond does operate to prevent the defendant in this action from protecting himself from the plaintiff's demand by the covenant for conveyance and assurance contained in the indenture of the 15th of November 1794.

*The tender of a bond of indemnity (after action brought,) as a compliance with a stipulation in a contract, in virtue of which the money was received, to recover which the action was brought and the refusal of such bond by the defendant, will not influence or affect the decision of the case*

*Harper.* The tender and refusal of a sufficient indemnity at the trial, precludes the defendant from availing himself of the want of indemnity. This certainly is the substantial justice of the case. The stipulation in the contract of August 25, 1794, admitting it to be a condition precedent, could only mean, that before the defendant actually delivered the notes, or paid the amount, he should be indemnified. The only difference to him would be the costs and depreciation which may be allowed in assessing the damages. By the tender, and other circumstances, the condition precedent is in part performed. 1. The condition was that he should be saved harmless. 2. It is in proof that he has till now been saved harmless. 3. The offered indemnity secures him in future. The doctrine of relation applies to this case. The plaintiff's right of action did not commence on his giving the indemnity. Like the case of a title to land, which *commences* on the certificate, and is perfected by the patent. The last act, when done, will, upon the usual principle, relate back to the first act. If by the plaintiff's delay to perfect his right, the defendant has suffered an injury, as by the depreciation of the notes in his hands, &c. he may be compensated in the assessment of damages. Perhaps this tender and refusal standing alone, might not be sufficient. But it must be taken in connexion with the antecedent circumstances. 1. That this deed was accepted by *M.* and *N.* who have never objected to it, nor called on the defendant under his stipulation. 2. That the defendant made this stipulation with a perfect knowledge that it could not be fulfilled within the time, further than by the delivering of this deed. 3. That he never has been called on himself, nor called on the plaintiff, for a deed free from this defect, which might at any moment have been obtained. 4. That he received the whole money, and now at the trial, for the first time, alleges, as an excuse for detaining it, this defect, from which he has not received and cannot receive any injury. Can there be a more flagrant abuse of legal principles, or a more glaring injustice?

CHASE, Ch. J. The court are of opinion, and so direct the jury, that the tender of the bond to the defendant in the manner stated, and the refusal of it by the defendant, ought not in any manner to influence or affect the decision of this case, nor the verdict of the jury thereon. The plaintiff excepted. Verdict and judgment for the defendant.

The plaintiff appealed to the Court of Appeals; and the case was argued in that court at June term 1808, by *Martin* and *Key*, for the Appellant, and the Appellant in proper person; and by *Johnson*, (Attorney-General,) and *Magruder*, for the Appellee, before *Tilghman*, *Nicholson* and *Gantt*, J. It was continued under *curia ad. vult.* and in consequence of the death of Judge *Tilghman*, until December term 1809, when the Appellant *dismissed* his appeal.